# Sampson v. Fox.

*Action on Promissory Note.*

1. *Assumption of debt; effect of.*—Where one person assumes the debt of another, the creditor has the right to accept or reject the assuming party as his debtor. Without acceptance, the obligation to assume can be enforced only by the original debtor, and not by the creditor. The effect of an acceptance by the creditor is merely a change of debtors, not a payment of the debt.

2. *Obligation of corporation not binding on its stockholders or officers individually; absence of presumption of payment of claim due from a corporation to its president and principal stockholder.*—The maker of a note de-

posited with the payee, as collateral security, a claim due to him from a corporation. All the property of this corporation was transferred to, and all its debts assumed by another corporation, of which the payee of the note was the president and principal stockholder. The note became the property of a bank of which the payee was one of the owners. *Held*, in an action on the note by the assignee of the bank, that there was no presumption of the payment of the claim deposited as collateral security, on the principle that the obligation to pay and the duty and authority to demand and receive payment co-existed in the same person, as it was the payee individually who had the right to demand and receive payment of the claim; and the fact that he was the president and principal stockholder of the corporation which assumed the payment of it did not render him individually liable for that obligation.

3. *President of private corporation; duty of, as to payment of corporate debts.*—Where it is not shown that the right and duty of the president of a private corporation to pay the corporate debts exist by general usage, that duty does not rest upon him, by virtue of his office merely, if it has not been imposed or authority been conferred by the corporation.

4. *Payment of partner's individual debt with partnership assets not to be presumed.*—Where a partnership held, as collateral security for a note owned by it, a claim for the payment of which one of the partners was individually bound, it will not be presumed, in an an action on the note, that there has been a payment of the note by the payment of the collateral out of the partnership assets, as this would be presuming that the wrong was done of applying partnership assets to the payment of the individual debt of one of the partners.

5. *Plea of payment; burden of proof.*—The plea of payment, in an action on a note, is an affirmative plea, the burden of proving which is on the defendant.

6. *Pledge of debt as collateral; duty of pledgee, under the terms of the pledge.*—The maker of a note pledged, as collateral security, a claim due to him from a private corporation, the terms of the pledge, as incorporated in the note, after describing the collateral, being as follows: "And I hereby give to the holder full power or authority to sell or collect, at my expense, all or any portion thereof, at any place,  *  *  *  *  at public or private sale, at his option, on non-performance of above promise," etc. *Held*, that the rights and duties of the parties are to be measured by this agreement; that a mere option was conferred on the holder of the collateral; that the authority to collect the collateral devolved on the holder the duty and liability of an agent, binding him, as an agent, only to ordinary care and diligence; and that, the corporation owing the debt pledged as collateral having become disorganized before the maturity of the note secured, rendering a suit at law against it impracticable, it was not the duty of the pledgee to resort to the extraordinary remedies of a court of equity to reach and subject to the payment of the collat-

[Sampson v. Fox.]

eral property which the corporation had conveyed before it ceased to exist.

APPEAL from the Circuit Court of Colbert.
. Tried before the Hon. H. C. SPEAKE.

J. B. MOORE, for appellant.—1. The taking of the collateral did not impair the original liability of appellee. —4 Ala. 58. 2. The original debtor can be sued, although his creditor has collaterals in his hands. All that is required is that the creditor produce the collaterals on the trial and offer to surrender them.—41 Ala. 222; 27 Ala. 254. The only obligation on one who holds collateral is to try to collect it. If he fails to collect, and is not chargeable with *laches*, he may recover on the original debt.—1 Brick. Dig. p. 288, § 517. Suit could not have been brought against the corporation owing the debt pledged as collateral, as it had no property, and was not even in existence. 3. The fact that the Tuscumbia Water Company purchased all the property of the Electric Light and Water Company, assuming to pay all the latter's debts, was a transaction with which neither the Tuscumbia Banking Company nor the appellant had anything to do. 4. Hinton E, Carr, one of the partners in the Tuscumbia Banking Company, had no right to use the partnership assets to pay his individual debt, to the prejudice of partnership creditors. 5. The decision of the court below that, because one of the partners in the Tuscumbia Banking Company was a stockholder in a corporation which had assumed to pay a debt held by the Banking Company as collateral security, the law would presume such debt had been paid,— was erroneous. Authority to support such a ruling cannot be found anywhere.

KIRK & ALMON and ISAAC ORME, *contra.*—1. The decision of the court that the law presumed that the debt had been paid is based on the idea that, as Carr had received the $7,000 from the sale of the bonds, out of which the Water Company had agreed to pay the debt, and it being Carr's duty, as one of the parties holding the collateral, to demand and accept payment of the collateral, and it also being his duty as president of the Water Company to pay the debt, the law presumes the

[Sampson v. Fox.]

debt had been paid.   This view of the case is supported
by the following authorities : *Dickie v. Dickie*, 80 Ala.
57 ; *Miller v. Irby*, 63 Ala. 477.   2.   When the $7,000
was raised by the Water Company, through its presi-
dent, H. E. Carr, by a mortgage of all its property, it
was then in the power of Carr, representing the Banking
Company, to have collected the collateral ; and it was
his duty to do so.—2 Amer. & Eng. Encyc. of Law, 48,
note 1.   3.   The note in which the claim was tranferred
created something more that a mere collateral.   It gave
the bank the right to "sell or collect" the claim, at the
expense of the maker of the note.   This placed on Carr
and his partner in the banking business the duty of col-
lecting the collateral and placing the collection as a
credit on the note.   And as their failure to collect it was
the result of their carelessness and neglect, the damage
must fall on them.—3 Brick. Dig. 93, § 168.   The pledgee
of negotiable instruments is bound to use the reasona-
ble, ordinary care of a prudent man in its collection.
He is the pledger's attorney or agent for that purpose,
and must use the care that such a person is called upon
to exercise.—18 Am. & Eng. Encyc. of Law, 683 ; *Buck-
ingham v. Payne*, Barb. (N. Y.) , 81 ; *Lawrence v. McCal-
mont*, 2 How. (U. S.) 426.

BRICKELL, C. J.—The action is founded on two
promissory notes made by appellee, payable to the order
of Hinton E. Carr, at the Tuscumbia Banking Company,
Tuscumbia, Alabama ; the one of date September 5th,
1892, for the payment of one hundred dollars, thirty
days after date ; the other of like tenor, of date Novem-
ber 28th, 1892, for the payment of three hundred and
six dollars, sixty days after date.   The first note contains
a clause in these words, after the words value received :
"having deposited or pledged as collateral for the pay-
ment of this note, pledging as collateral security for
same, my account against Tuscumbia Electric Light and
Water Co., showing a balance due of $409.22.   And I
hereby give to the holder full power and authority to
sell or collect, at my expense, all or any portion thereof,
at any place, either in the city of Tuscumbia, or else-
where, at public or private sale, at his option, on non-
performance of above promise, and at any time there-
after, and without advertising the same, or otherwise,

giving five days notice, in case of public sale ; the holder may purchase, without being liable to account for more than the net proceeds of sale.'' The second note contains a clause in all respects similar, except that the collateral is described as ''all of my claim against the old Electric Light & Water Co.''

The defendant pleaded the general issue, *nil debet*, and four special pleas. The first special plea was payment to Carr, at maturity of notes, and before they were transferred to plaintiff. The second was of payment by the transfer of the collateral to Carr, on the maturity of the notes. The third and fourth purport to be pleas of set off, and in substance allege the transfer and pledge of the collateral, the negligence of Carr, and of the Banking Company, in its collection, whereby the same was lost to the defendant.

The issues were, by the consent of the parties, tried by the court, without the intervention of a jury. The plaintiff read the notes in evidence, and proved that they belonged to and were assets of the Tuscumbia Banking Company, a partnership composed of Hinton E. Carr and Emma Carr, which failed on the 8th day of June, 1893, and on the 10th June, 1893, made to the plaintiff a general assignment of all its assets. The plaintiff produced the collateral in court, and offered to surrender it. The collateral were accounts due from the Electric Light & Water Company, a corporation ; and plaintiff proved that on the 20th of September, 1892, the said coporation sold and transferred all of its property to a new company, called the Tuscumbia Water Company, and thereafter the former company ceased to exist.

The defendant was examined by deposition in his own behalf, and testified that, when the first note was made, Carr who was president of the Ice Factory, and also of the Tuscumbia Banking Company, said to him that there would be a consolidation of the Tuscumbia Light & Water Company and the Tuscumbia Ice Factory. At that time he got from Ross, the treasurer of the Electric Light & Water Company, a statement of the amount due him from the Company, carried it to Carr, and on it as collateral Carr loaned him $100. In the following November he borrowed from Carr $300, ''or in other words he gave me $300, and I assigned him over

my claim for $400, or maybe a little over $400, on the Tuscumbia Water Company consolidated, and Mr. Carr told me to assign him my claim, and in 30 days he would have the bonds of the Consolidated Company sold, and have the money, and he would then cancel my notes, and send them to me; he took my claim in payment of my two notes to the bank." Further he testified: "I made the transfer of my claim against the Tuscumbia Light & Water Company to the Banking Compny, H. E. Carr, at the time and date, simultaneously with the date of my last note of $300 to the bank, and delivery to me of the money, at which time he agreed to take the claim and pay my two notes." Further, he testified: "Then after, or about two or three months afterwards, I had a conversation with Mr. H. E. Carr, at the bank. I asked him if he had ever sold the bonds; that I did not want the interest on the two notes to be accumlating against me. He then said to me, 'you need not give yourself any uneasiness,' as my claim that I had transferred to him was quite sufficient, and he would and had taken that in payment of my two notes to the bank." Further, he testified: "H.E.Carr was president of the Tuscumbia Banking Company. He was president, superintendent, and general manager of the Tuscumbia Water Company; and he said they, the two Companies, would be consolidated in a few days. He said he owned two-thirds of the Tuscumbia Water Company, and he wanted enough claims and stock to continue him in the control of the consolidated company, and in the consolidation, or agreement of consolidation, he had agreed to pay my claim, and the claim of Thompson & Houston Company, of Atlanta, Ga. He had given his individual notes for the Thompson & Houston Company and, if not mistaken, my claim." He further testified that neither the bank or its officers had returned or offered to return his claim against the Tuscumbia Light & Water Company, and that it could have been collected by the use of due diligence. That the company at the time the notes fell due was solvent.

R. L. Ross, a witness for defendant, testified that the Tuscumbia Water Company was formed as a coporation the 18th or 20th of September, 1892. The Electric Light & Water Company owed the defendant about $400, and owned the electric light plant and arc lights, and

[Sampson v. Fox.]

had a franchise for a water company. It sold all of its property to the Tuscumbia Water Company, and had no property of any kind left. Carr was not a stockholder in the Electric Light & Water Company; nor was the Tuscumbia Banking Company. He was the principal stockholder in the Tuscumbia Water Company, and made an offer to buy all the property of the Electric Light & Water Company, and the property was sold about the 18th or 20th September, 1892; the Water Company assuming to pay the debts, (including the debt due the defendant), of the Electric Light & Water Company; the company then owing about $3,500. The property of the Water Company can not be sold for more than $4,000. Charles Womble, a witness for defendant, testified that he was secretary, treasurer and general manager of the Tuscumbia Water Company, of which Carr is the president and principal stockholder. That the Water Company has not paid, as it assumed to pay, any of the debts of the Electric Light Company. That it owes in addition fifteen or sixteen hundred dollars; "and its bonds, to the amount of $7,000, are out, and in the hands of Armstrong, cashier of a bank at Memphis, and there is a mortgage on its property to the amount of twenty-five thousand dollars." Carr, as a witness for the plaintiff, testified that he had not, nor had the Tuscumbia Banking Company, ever collected any part of the collateral mentioned in the notes. That he had made no agreement with respect to the collateral, except that stated in the notes. That he had never said to the defendant to assign him the collateral, and in 30 days he would have the bonds of the consolidated company sold, and have the money, and he would then cancel the notes, and send them to the defendant. That he did not take the collateral in payment of the notes. That it was taken as collateral security, and has not been paid. That, except as shown in the notes, there was no transfer of the collateral to him, or to the Banking Company, That he made no agreement with the defendant to take the collateral and pay the notes for the Banking Company. That he did not have with the defendant any of the conversations to which he testifies. That the collateral had not been taken, or agreed to be taken, in payment of the notes. The plaintiff, as a witness, testified that, since the collateral came

to his hands, no part thereof, had been collected. That
the Electric Light & Water Company, within his knowl-
edge, had not had any property since the sale in 1892 to
the Water Company. This was all the evidence.

The bill of exceptions recites, as the findings and judg-
ment of the court, that "the court held and decided that,
as Hinton E. Carr, one of the partners in the Tuscum-
bia Banking Company, was president of the Tuscumbia
Water Company, and its principal stockholder, which
company had assumed to pay all the debts of the Elec-
tric Light & Water Company, the law presumed that
the debt due from the Electric Light & Water Company
had been paid.     *    *    *    *    The court further ruled
that the presumed payment of the collateral paid the
notes sued on, and that plaintiff could not recover."
Thereupon the court rendered judgment for the defen-
dant, from which the appeal is taken.

We can not assent to the theory upon which the court
below based the judgment. The promise or obligation
of the Tuscumbia Water Company to pay the debts of
the Electric Light & Water Company, as matter of fact
or of law, raised no presumption of their payment   It
created a duty, and primarily a duty owing only to the
Electric Light & Water Company, to make payment of
the debts, performance of which that company alone
could enforce. The debts remained, as they were con-
tracted, the liabilities of the party contracting them.
The creditors to whom they were owing had the election
to accept or reject the Water Company as the debtor, as
a party may accept or reject any promise made by a
third party to another for his benefit. But, without
acceptance, the creditors could not enforce the promise.
And if they elected nor to accept, the promise or obliga-
tion was due only to the Electric Light & Water Com-
pany, and the company alone had the right to compel
performance of it. Whether there was acceptance or
rejection, the debts were not paid. If there was accept-
ance, there was only a change of debtors, not payment
of the debts. The creditors accepting simply became
entitled to enforce for their own benefit the promise or
obligation which had been made to their debtor.—*Henry
v. Murphy*, 54 Ala. 246.

The principle on which the court seems to have pro-
ceeded is that, when the dual obligation to pay and the

duty and authority to demand and receive payment of a debt co-exist in the same person, the law presumes, and conclusively presumes, the debt to be paid. But there must be concurrence and co-existence of the legal obligation to pay and of the authority and duty to demand and receive payment. If the two do not concur and co-exist, there is no room or reason for the presumption. The principle, in this court, has been of most frequent application when a debtor to a testator, or to an intestate, takes probate of the will and qualifies as executor, or obtains a grant of administration. Then his debt is in contemplation of law paid, for the obligation to pay and the duty and authority to demand and receive payment co-exist.—*Miller v. Irby*, 63 Ala. 477. The obligation to pay the debts of the Electric Light & Water Company was never assumed by or rested on Carr; nor had he the authority to receive payment of them. The obligation to pay was the obligation of the Water Company, and not in any proper or legal sense the obligation of any of the stockholders, or officers, or agents. Individual liability for corporate obligations or debts, if it be not imposed by express legislative enactment, is not an incident of membership in a corporation.—*Smith v. Huckabee*, 53 Ala. 191; Ang. & Ames Cor. §§ 41—591. Nor is there liability upon corporate officers or agents because of contracts into which they lawfully enter on behalf of the corporation. 1 Beach, Priv. Corp., § 267.

In the argument of the counsel for the appellee it is said the decision of the court below was based "on the idea that as Carr had received the $7,000 from the bonds, out of which the company had agreed to pay the debt, and it being Carr's duty, as one of the parties holding the collateral, to demand and accept payment of the collateral, and it also being his duty as president of the Water Company to pay the debt, that the law presumes the debt to have been paid." The predicate on which this idea rests is that Carr has received $7,000 from the bonds. If the predicate is not supported by the evidence, the idea is without basis. All that is said about bonds in the course of the evidence (except declarations imputed to Carr by the defendant, which are denied) is in the testimony of Womble, stating the liabilities of the Water Company, and is in these words: "And its bonds to the amount of $7,000 are out, and in the

hands of Armstrong, cashier of a bank at Memphis.''
Whether the bonds were a mere deposit with Armstrong,
or were entrusted to him for negotiation, is not stated.
Certainly, there is no fact stated from which it is fair
and reasonable to suppose that Carr had received money
for them to any amount. It would be as fair and reason-
able to suppose that Womble, who was the secretary,
treasurer and general manager of the company, had re-
ceived money for the bonds;—a supposition which no
trier of facts, in the course of judicial investigation,
would be invited to indulge.

Nor is there any foundation for the idea that it was
the duty of Carr, as its president, to make payment of
the debts of the Water Company. There is no evidence
that such duty had been imposed, or authority had been
conferred, by the company; nor that either exists by gen-
eral usage. In 1 Morawetz Corp. § 537, it is said: ''The
implied powers of the president of a corporation depend
upon the nature of the company's business, and the
measure of the liability delegated to him by the board of
directors. It seems that a president has no greater
power, by virtue of his office merely, than any other di-
rector of the company, except that he is the presiding
officer of the meetings of the board.'' The Supreme
Court of New Jersey said: ''In the absence of anything
in the act of incorporation bestowing special power upon
the president, he has, from his mere official station, no
more control over the corporate property and funds than
any other director. The affairs of corporate bodies are
within the exclusive control of their boards of directors,
from whom authority to dispose of their assets must be
derived.'' What were the duties of the Tuscumbia
Banking Company, the holder of the collateral, affected
and bound by the acts of Carr, one of the partners, in
reference to the collateral, we pass for future consider-
ation. For the reasons we have given, we do not con-
cur in the theory on which the court based its first find-
ing or conclusion.

The second finding of the court, that the presumed
payment of the collateral operated a payment of the
notes on which the suit is founded, is equally untena-
ble. If there had been the obligation to pay the collat-
eral resting on Carr, it was an individual obligation.
It did not rest on the Banking Company, nor was it as-

sumed by him in the relation or capacity of a partner in the company. It is merely elementary to say that partnership assets cannot be appropriated to the payment of the individual debts of either partner. 1 Bates, Law of Partnership, § 410. In *Burwell v. Springfield*, 15 Ala. 273, it was said by COLLIER, C. J.: "One partner cannot release a debt due from the firm, in order to extinguish his individual liability; nor can a debt due to a partnership be discharged by one of the partners applying it in payment of an individual debt, owing by him to the debtor of the firm, without the knowledge and approbation of the other member of the concern." The law never presumes wrongdoing; and cannot presume that a partner has misappropriated assets, or that others dealing with him have participated in the misappropriation. Yet this is the presumption which seems to have been indulged, to reach the conclusion that the notes were paid.

There are other grounds upon which it is insisted the judgment of the court below should be affirmed. The first is that the debt due from the Electric Light & Water Company to the defendant was accepted by the Banking Company in payment of the notes, on which the suit is founded,—the matter of the third and fourth pleas. Payment of a debt is an affirmative plea, the burden of proving which is on the party pleading, "who must prove the payment of money, or something accepted in its stead, made to the plaintiff, or to some person authorized in his stead to receive it." 2 Green. Ev. § 516. As the rule has been often expressed in our decisions, "A party pleading or relying on payment must prove it; the fact is peculiarly within his knowledge, and though his adversary in pleading negatives it, the negative averment is taken as true until disproved." 3 Brick. Dig. 698, § 1. If it be conceded that the pleas are supported by the evidence of the defendant, the concession must be made that they are disproved by the evidence of Carr, with whom the transactions were had, and by whom it was alleged the payment was accepted. It would serve no useful purpose to analyze and discuss their contradictory evidence, inquiring which is the more consistent with the conduct of men of ordinary prudence, in the course of the transactions they narrate. The court below made no finding in reference to these

pleas and the existence of the facts on which they are based. If we resort to presumption, the presumption must be that the finding, in this state of the evidence, would have been that the pleas were not supported,— that the defendant had not satisfied the burden of proof resting upon him. In *Lehman v. McQueen*, 65 Ala. 572, considering a question of payment, the court said: "In the consideration of all questions of this character, dependent upon conflicting evidence, it is important to inquire, and in bear mind, upon which party lies the burden of proving the disputed fact. For, when the law casts the burden of proof upon a party, if he does not offer evidence of the fact, for all the purposes of the particular case, the non-existence of the fact must be asumed. Or, if the evidence in reference to the fact is equally balanced; or, if it does not generate a rational belief of the existence of the fact, leaving the mind in a state of doubt and uncertainty, the party affirming its existence must fail for want of proof. The burden of proving a disputed fact rests, in all cases, upon the party affirming its existence, and claiming to derive right and benefit from it. * * * * A plaintiff proves the existence of a debt which the defendant claims to have paid. In the first instance, proof of the debt would rest on the plaintiff, if it was denied; and if his evidence was insufficient, he would fail for want of proof. But the debt being proved, the burden of proving payment rests upon the defendant; and if his evidence is insufficient, he would fail for want of proof." The defendant has not supported the pleas of payment; the burden of proof resting upon him is not discharged.

The remaining insistence is that the Banking Company, by its failure to collect the debt of the Electric Light & Water Compny, suffering the company to sell and dispose of all its property and franchises, whereby the debt was lost, is answerable to the defendant for the loss. It may well be doubted whether the loss of the debt is shown by the evidence. By the sale, all the property and franchises of the company were charged with a trust for the payment of its debts; a trust which would prevail against all other than *bona fide* purchasers from the Tuscumbia Water Company, without notice; and the evidence shows that at the time of the trial, the value of the property equalled, if it did not exceed, the

debts. However this may be, we are not of opinion the insistence can be supported. The question depends materially on the terms of the pledge, as incorporated in the notes, connected with the attending facts. The first pledge of the debt was as collateral security for the payment of a note of one hundred dollars, having thirty days to run. After the maturity of that note, there is a second pledge of the balance of the debt, to secure the payment of a note for three hundred and six dollars, having sixty days to run. The terms of each pledge are the same: "And I hereby give to the holder full power and authority to sell or collect, at my expense, all or any portion thereof, at any place, either in the city of Tuscumbia, or elsewhere, at public or private sale at his option, on non-performance of above promise," &c. It is this agreement by which the rights and duties of the parties are to be measured, rather than by any general rule of law which, in the absence of the agreement, would regulate their general rights and duties on a general pledge of negotiable or non-negotiable securities for the payment of debts. *Lawrence v. McCalmont*, 2 How. (U. S.) 426; *Roberts v. Thompson*, 14 Ohio St. 1; (s. c. 82 Amer. Dec. 465). The pledge doubtless contemplates that the holder of the notes would abstain from any and all acts by which the value of the pledge would be deteriorated, keeping it ready for restoration on payment of the notes. This is mere passiveness. And if payment had been tendered, it must have been accepted. But it was not contemplated that the holder should exercise any diligence in the collection, or in the making the sale of the collaterals. The two are conjoined by the agreement, and committed to the mere option of the holder of the notes. There was authority to collect the collateral. At the utmost this would devolve on the holder of the notes the duty and liability of an agent; and as an agent binding him only to ordinary care and diligence. It is apparent that by the exercise of no ordinary diligence, the pursuit of no ordinary legal remedies, there could have been collection of the collateral. Before the maturity of the first note the sale to the Water Company was effected, and thereafter, as the bill of exceptions recites, the Electric Light & Water Company ceased to exist. The inference is that the company became disorganized, rendering a suit at law

against it impracticable. If it is suggested that equitable remidies could have been pursued to reach and subject the property conveyed to the Water Company, the answer is that such remedies are extraordinary, the holder could not be expected to pursue. We find no room in the evidence for the imputation of negligence to the Banking Company, in reference to the collateral.

The result is, the judgment must be reversed, and a judgment here rendered that the plaintiff have and recover of the defendant the principal of the notes, with the interest computed to this day, together with the costs in the Circuit Court and the costs of this court.