BELL, Appellant, *v.* GRIMSTAD, Executrix, Respondent.

(No. 6,215.)

(Submitted March 5, 1928. Decided April 2, 1928.)

[266 Pac. 394.]

*Sales—Debt—Defense of Payment—Burden of Proof—Directed Verdict — When Error — Principal and Agent—Contracts— Ratification.*

Debt—Payment—Burden of Proof.
> 1. Where the defense in an action of debt, the existence of which has been proven by plaintiff, is payment, the burden of establishing payment rests upon defendant, though it was necessary for plaintiff to allege nonpayment in his complaint.

Principal and Agent—Ratification of Act of Agent by Acceptance of Benefit Flowing Therefrom.
> 2. A principal who, with knowledge, accepts the benefits of a transaction conducted by an assumed agent, is deemed to have ratified it in toto.

Same—Principal Accepting Contract Made by Agent Takes It as Made Even Though Agent Acted in Excess of Authority.
> 3. Where a principal accepts a contract made by his agent he takes it as the agent made it and subject to all equities and

---

1. See 20 Cal. Jur. 952; 21 R. C. L. 119.
2. See 1 Cal. Jur. 773; 21 R. C. L. 932.

defenses arising out of the conditions thereof, and the means and instrumentalities by which the agent procured it, even though the agent acted without authority or in excess of his powers.

Directed Verdict—When Proper.

4. No case should be taken from the jury on motion for a directed verdict when reasonable men may draw different conclusions from the evidence or where there is substantial evidence to support the complaint, but only where from the undisputed facts the conclusion necessarily follows, as a matter of law, that a recovery cannot be had on any view which may reasonably be taken from the facts established.

Debt—Defense of Payment—When Directed Verdict for Defendant Error.

5. Under the above rule (par. 4) *held*, in an action to recover a balance due, in which the defense was payment alleged to have been made to a bank or one of its officers as the agent of plaintiff, that the court erred in directing a verdict for defendant at the close of all the evidence, where the existence of the debt was established and there was a substantial showing that it had not been paid.

---

[1]   Payment, 30 **Cyc.**, p. 1264, n. 28.
[2, 3]   Agency, 2 **C. J.**, sec. 114, p. 493, n. 55; sec. 144, p. 522, n. 84; sec. 731, p. 960, n. 7.   Sales, 35 **Cyc.**, p. 576, n. 97.
[4, 5]   Trial, 38 **Cyc.**, p. 1540, n. 47, p. 1578, n. 40.

*Appeal from District Court, Yellowstone County; O. F. Goddard, Judge.*

ACTION by John Bell against Carmen H. Grimstad, executrix of the will of O. King Grimstad, deceased. Judgment for defendant and plaintiff appeals. Reversed and remanded for new trial.

*Messrs. Wood & Cooke,* for Appellant, submitted a brief; *Mr. Sterling M. Wood* argued the cause orally.

*Messrs. Brown, Wiggenhorn & Davis,* for Respondent, submitted a brief; *Mr. Horace S. Davis* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiff to recover from O. King Grimstad as defendant the sum of $7,868.05, a balance alleged to be due on the sale of a band of sheep, together with

---

4.   See 24 **Cal. Jur.** 913; 26 **R. C. L.** 1067.

the sum of $1,100, the value of certain Liberty bonds, with interest on both items, which total $8,968.05, from March, 1922. Issue was joined by an answer and reply thereto, and the cause was brought on for trial before the court sitting with a jury. At the conclusion of all of the evidence introduced by the parties, plaintiff and defendant, the court sustained the defendant's motion for a directed verdict. Verdict and judgment were accordingly regularly entered and the appeal is from the judgment.

The only question presented by the plaintiff's several assignments of error necessary to be considered in disposition of the appeal is whether the court was in error in directing a verdict.

By the complaint the plaintiff claims a balance due from Grimstad upon the sale and delivery to the latter of 1,945 head of ewes of the ''reasonable worth and agreed value of $11 per head, subject to a certain mortgage lien thereon,'' which the defendant assumed and agreed to pay as a part of the purchase price; also, the expense which was incurred by the plaintiff in connection with the trailing of the sheep, amounting to the sum of $120, and additionally the value of certain Liberty bonds of the United States, amounting to the sum of $1,100, which it is alleged were deposited in pledge as additional security for the payment of the mortgage indebtedness, and which were delivered to Mr. Grimstad upon the payment by him of such indebtedness.

The answer admits the deposit of the Liberty bonds and their delivery to Grimstad upon payment made in satisfaction of the mortgage upon the sheep, and denies the remaining allegations of the complaint. By way of further defense it is alleged that ''if O. King Grimstad, deceased, purchased said sheep or any thereof, he paid the owner the full purchase price therefor; that the First National Bank of Ingomar, a national banking association, negotiated the sale of said sheep and sold the same either as owner or as agent for the plaintiff, and if said bank was the agent of the plaintiff in the sale of said sheep, it was authorized to collect and receive the pur-

chase price" agreed to be paid therefor, and that the full amount thereof was paid to the bank as agent for the plaintiff; that payment for the sheep was made to the bank in reliance upon its representation that it was authorized to act as agent for the plaintiff, and with knowledge on the plaintiff's part, who acquiesced therein and is thereby estopped to deny the bank's authority.

We have made careful examination and study of the record in order to make an intelligent statement of the facts thereby disclosed, as the record is not so connected as to make it readily understandable.

It appears that in the spring of 1922, the plaintiff was possessed of a band of sheep which he ran near the town of Ingomar. Mr. Grimstad, with whom he was then slightly acquainted, wrote and asked for a price on them, and the plaintiff replied in effect that Mr. Grimstad would not be willing to pay what the plaintiff considered the sheep were worth, and further personal negotiations between them ceased. At that time the plaintiff was doing his banking business with the First National Bank of Ingomar, hereinafter referred to as the bank, of which Mr. Craig was president. There was a mortgage on the sheep to the War Finance Corporation amounting to $11,000, which had been negotiated through the Ingomar Co-operative Association. Mr. Craig was then also the local representative of the War Finance Corporation. In securing the loan the plaintiff had deposited Liberty bonds in pledge to the amount of $1,100, in addition to the mortgage security on the sheep. On March 19, 1922, the plaintiff, by written contract, sold the clip of wool to be sheared from the sheep in the year 1922 to J. Korchland & Co., and an advance payment of $2,500 was paid to the bank to his credit. Mr. Bell says that Craig signed his name to the contract and that he must have known that Mr. Craig had made the contract for him. On or about March 27, 1922, Mr. Craig called upon Mr. Bell, suggesting that the latter sell the sheep to Mr. Grimstad, and the bank then being in need of money it was by the bank,

in writing, agreed by way of inducement for such sale as follows:

"I, W. T. Craig, Pres. of the First National Bank, do hereby agree that if ewes owned by John Bell are sold any amount received per head under $12.50 per head will be credited by this bank to him. First National Bank of Ingomar, Mont. W. T. Craig, Pres. March 27, 1922. Myers, Mont."

Explaining this transaction, the plaintiff testified: "The arrangement which I made for payment for the sheep was that Mr. Grimstad was to pay me $11, and the First National Bank of Ingomar was to pay me a dollar and a half. The bank was to pay me a dollar and a half because it was an accommodation to them to be able to make the deal with Mr. Grimstad. I expect the accommodation to the bank was that the bank was anxious to get this money. * * * Mr. Craig told me the bank was in need of money to carry them until shearing."

On April 11 following, the sheep, numbering 1,945, were, pursuant to previous agreement of sale, delivered at Ingomar to Grimstad, the latter agreeing to assume the mortgage indebtedness and Bell agreeing to deduct the $2,500 paid on the wool from the amount due him and to assign the wool contract and his stock certificate in the Ingomar Co-operative Association, all of which was completed.

In connection with the consummation of the sale the plaintiff testified: "I told Mr. Grimstad to go to Mr. Craig and have the War Finance loan and everything properly fixed up and settled up with Mr. Craig, as he was an officer of the War Finance." Plaintiff's instructions appear to have been carried out, as the wool contract was indorsed to Grimstad "by W. T. Craig, Agt." As to such assignment the plaintiff said: "I see the indorsement on it [the wool contract], but that is not my signature. It is my signature signed by Mr. Craig. I see it is signed there 'by W. T. Craig, Agt.' I must have known that Mr. Craig had made this contract for me. * * * That is his assignment that I find on the back of it there. He must have assigned it for me. As a matter of fact, he did.

The reason I assigned this wool contract to Mr. Grimstad [was] so that it would be taken out of the purchase price of the sheep. I understood and knew it was assigned to Mr. Grimstad although I myself did not sign the assignment. I remember the occasion when Mr. Craig made the assignment for me.''

Mr. Grimstad paid the mortgage loan on the sheep amounting to $11,146.95, but as the loan was made by the Ingomar Co-operative Association, pursuant to the contract of sale of the sheep, the plaintiff was to assign his stock in that association to Grimstad. Respecting such assignment, Bell testified: ''I did assign my stock in this co-operative association myself to the defendant Grimstad. Mr. Craig indorsed it, if it is indorsed. He must have signed my name to it. * * * At the time I made sale of the sheep I knew that the certificate would be assigned, and I intended that it should be assigned at that time. * * * The indorsement on the back * * * is not my signature. W. T. Craig signed my name thereto.''

About the 15th of July, 1922, in the presence of Charles Foster, at Ingomar, the plaintiff made demand upon Mr. Grimstad for the balance claimed to be due on the sheep. Grimstad then said he had paid Mr. Craig for them, and that when he returned to Billings he would render a statement of the account. As a result of this conversation, Grimstad wrote a letter to the plaintiff dated July 20, 1922, and received about July 23, 1922, embodying a complete statement of the account and showing full settlement, which was introduced in evidence by the plaintiff. The plaintiff made no reply thereto, and as a witness, in discussing the several items of the account, including the Liberty bonds, said that it is correct, except as to the payment of the balance due him.

After the letter containing the account was received by the plaintiff, he demanded payment from Mr. Craig, and not receiving the money by him claimed, he says: ''I took it to my attorneys, and it has been there ever since; I have not been paid.'' The bank failed a day or so after the plaintiff had

received the statement of account from Grimstad, approximately, July 25, 1922. Mr. Bell says he did not know that he had been given a credit of $9,000 at the bank represented by a certificate of deposit or a credit to his savings account until he had an auditor go over the books late in the fall of 1922. "When my accountant went over the books of the bank some time in the fall of 1922, I learned that a credit had been given to me there at the bank; that is, a certificate of deposit had been issued. * * * It was for a sufficient amount to equal the amount I had coming. The amount I had coming was around $9,000." And further: "I never made that deposit to my own knowledge. I did not make any other deposit that this could have represented. So far as this certificate is concerned, I feel that I am not entitled to it at all. It was not mine." Again he testified: "I received a letter from the First National Bank of Ingomar, signed W. T. Craig, as president. * * * I have seen it but don't think I had the original letter. I think this (Defendant's Exhibit 9) is the one that I have seen. I think this letter was written in the county attorney's office in Forsyth about something along about the first of August. * * * It was written by the stenographer. It was signed by W. T. Craig. It has his signature on it there. I was present at the time. I can explain the circumstances of the letter having been written at that time and dated April 4. * * * I don't remember getting it. I don't know what became of the original. * * * I saw it signed by Mr. Craig. I think that was about the first of August; I am not sure. He dated it April 4."

The letter so identified reads:

"Ingomar, Mont., April 4, 1922.
"Mr. John Bell, Ingomar, Montana—

"Dear Sir: In accordance with our agreement, and in consideration of the sale of your sheep to help this bank when money was greatly needed to keep this institution going, you have a balance due you, on sale of 1,945 head of ewes of $1.50

per head. These sheep were sold to O. K. Grimstad, of Billings, at $11.00 per head and your price to us was $12.50.

"Yours very truly,

"FIRST NATIONAL BANK OF INGOMAR.

"By W. T. CRAIG, Pres."

Further, concerning this letter, Mr. Bell stated: "I received such a letter as Defendant's Exhibit 9 from Mr. Craig, or the First National Bank of Ingomar. The letter represents the arrangement that I had with the bank; it is the only arrangement that I had with the bank."

There is no question but what the sheep were delivered and accepted by Mr. Grimstad, and that upon payment of the mortgage indebtedness by him the Liberty bonds were delivered to him and by him retained; but the plaintiff swore positively he had never been paid "one penny" of the balance due him on the transaction. The only testimony offered by the defendant was to the effect that Bell had ratified Craig's action in indorsing Bell's name to the certificate of stock in the Ingomar Co-operative Livestock & Farm Association; and that Bell had stated that he had authorized the sale of his sheep to help the bank and knew of the certificate of deposit which had been issued to him by the bank covering the amount due him. The evidence introduced by the defendant was denied by the plaintiff, except as to that which he may have said to Mr. Jacobson concerning the indorsement of the stock certificate, as to which Bell says he does not remember.

After the defendant had rested, the plaintiff called one Harold B. Godfrey, a public accountant, as a witness in rebuttal, and made offer of proof by the witness that he had made examination of the books and records of the bank, and that thereby it was disclosed that payment had not in fact been by Grimstad made to the bank; and further "that no money whatever ever came into the bank as a basis for the issuance of the certificate of deposit to Mr. Bell, * * * or as a basis

for the credit to the account of Mr. Bell in the bank." Such offer of proof was denied.

At the trial, it is noteworthy that Mr. Craig was present in court as a witness under subpoena by both parties, and yet was not called as a witness. His testimony would doubtless have been enlightening. He must have been in possession of the facts.

Just when this action was commenced is not shown by the record, but an amended complaint appears to have been filed on December 19, 1924, before issue was joined. The cause was tried on December 8, 1926, and judgment entered December 11, 1926.

Issue was squarely drawn as to payment or nonpayment of [1] the alleged indebtedness. Was the plaintiff paid the money due him as pleaded by the defendant in her answer, or at all? Solution of the question involves the application of the law of agency, and the determinative question is: Upon whom did the burden rest to prove payment?

"In actions of debt, if the plaintiff proves the existence of the debt sued upon, the burden of establishing its payment is on the defendant, although, in his complaint, it was necessary for the plaintiff to allege nonpayment. Each party must allege every fact which he is required to prove, and will be precluded from proving any fact not alleged and he must allege nothing affirmatively which he is not required to prove. Negative allegations, however, are frequently necessary, though they are not to be proved. It has been held, as it was always held at common law, that in a complaint upon a promissory note, or other obligation to pay money, there must be an averment that the money had not been paid. This is necessary to make the complaint perfect upon its face. But it is a *non sequitur* to say that, because such negative averment is necessary in the complaint, therefore it is necessary for the plaintiff to prove it. The question is not one of pleading, but of evidence; not what must be alleged, but where the burden of proof lies." (Horwitz's Jones on Evidence, sec. 180, p. 25.)

"The defense of payment may be made under the general issue, in assumpsit, but in an action of debt on a specialty or a record, it must be specially pleaded. In either case, the burden of proof is on the defendant, who must prove the payment of money, or something accepted in its stead, made to the plaintiff, or to some person authorized in his behalf to receive it." (Greenleaf on Evidence, Lewis' ed., sec. 516.)

"It sometimes happens that the negative is used, but the particular averment is not an indispensable part of the proof. To illustrate, in actions of debt, if the plaintiff proves the existence of the debt sued upon, the burden of establishing its payment is on the defendant, although, in his complaint, it was necessary for the plaintiff to allege nonpayment. Similarly, in a complaint upon a promissory note, or other obligation to pay money, there must be an averment that the money has not been paid. This is necessary to make the complaint perfect upon its face." (2 Jones on Evidence, sec. 492.)

"Proof of nonpayment is ordinarily unnecessary to establish a cause of action, since the burden of proving payment is upon the party pleading it," and "if the alleged payment to the creditor was in property other than what is ordinarily denominated money, such as a draft, note or check, etc., the burden is on the payer to show that it was accepted by the payee as payment." (30 Cyc., pp. 1264–1266.)

"The burden of proving defenses of an affirmative nature, or in confession and avoidance, is upon the defendant. The reason is obvious. In such instances the effect of the pleading is to admit the material allegations of the complaint or declaration, but to seek to avoid the effect thereof by the affirmative allegation of new matter avoiding plaintiff's case. If the defendant pleads a release, in abatement, a discharge in bankruptcy or other substantive defense, the burden is upon him to prove such affirmative defense, because it is his affirmative defense and forms no part of the plaintiff's averments." (2 Jones on Evidence, sec. 486.)

And the rule appears to be universal that where the defense is payment, the burden rests upon the defendant to establish it by competent evidence. (Abbott's Trial Evidence, 2d ed., p. 548; Abbott's Trial Brief, "Mode of Proving Facts," 2d ed., p. 526; *North Pennsylvania Rd. Co.* v. *Adams,* 54 Pa. 94, 93 Am. Dec. 677; *Willis* v. *Holmes,* 28 Or. 265, 42 Pac. 989; *Standard Fashion Co.* v. *Joels,* 60 Okl. 195, 159 Pac. 846; *Winton* v. *Myers,* 8 Okl. 421, 58 Pac. 634; *Gutterman* v. *Schroeder,* 40 Kan. 507, 20 Pac. 230; *Boorigie Bros.* v. *Quinn-Barry Tea & Coffee Co.,* 73 Okl. 296, 176 Pac. 391; *Edwards* v. *Johnson-Larimer Dry Goods Co.,* 59 Okl. 101, 158 Pac. 446; 30 Cyc. 1264; 9 Ency. of Evid., p. 701; 20 Ann. Cas. 518; *Rice* v. *Kabak,* 72 Misc. Rep. 16, 128 N. Y. Supp. 1092; *Gamble* v. *Lewis,* 88 Misc. Rep. 139, 151 N. Y. Supp. 778; *Lerche* v. *Brasher,* 104 N. Y. 161, 10 N. E. 58; *Dose* v. *Hirsch Bros.,* 65 Misc. Rep. 515, 120 N. Y. Supp. 91; *Wolffe* v. *Nall,* 62 Ala. 24; *First National Bank* v. *Hellyer,* 53 Kan. 695, 42 Am. St. Rep. 316, 37 Pac. 130; *Knapp* v. *Runals,* 37 Wis. 135; *Sampson* v. *Fox,* 109 Ala. 662, 55 Am. St. Rep. 950, 19 South. 896; *Brown* v. *Morgan,* 56 Mo. App. 382; *Melone* v. *Ruffino,* 129 Cal. 514, 79 Am. St. Rep. 127, 62 Pac. 93; 22 Am. & Ency. of Law, 2d ed., 587; *Bradley, Wheeler & Co.* v. *Harwi,* 43 Kan. 314, 23 Pac. 566; *Banking Co.* v. *Walker,* 121 N. C. 115, 28 S. E. 253; *Truesdale Mfg. Co.* v. *Hoyle,* 39 Ill. App. 532; *Conselya* v. *Swift,* 103 N. Y. 604, 9 N. E. 489; *Curtis* v. *Perry,* 33 Neb. 519, 50 N. W. 426.)

That which was said by this court in *Yancey* v. *Northern Pacific Ry. Co.,* 42 Mont. 342, 112 Pac. 533, and followed in *Broat Lumber Co.* v. *Van Houten,* 66 Mont. 478, 213 Pac. 1116, relied upon by the defendant, is not at variance with the authorities respecting that which must be alleged in a complaint or counterclaim to state a cause of action, nor as to the affirmative proof required where the indebtedness is denied. The *Yancey Case* originated in a justice of the peace court, and was appealed to the district court, so that the defendant's counterclaim was deemed denied by the plaintiff. (Sec. 7013;

Rev. Codes 1907; sec. 9646, Rev. Codes 1921.) No replication was required. (*Duane* v. *Molinak,* 31 Mont. 343, 78 Pac. 588.) There was no plea of payment of the amount of the defendant's counterclaim, but rather a general denial of the indebtedness, in which instance, as stated in the opinion, it devolved upon the defendant to prove its allegation of nonpayment. However, where payment of the indebtedness sought to be recovered is pleaded in defense, the rule is universal that the burden rests upon the party pleading payment to prove it. The plea of payment admits the original existence of the debt, and shifts the burden of proof to the party who alleges it in avoidance.

It is not necessary to here do more than refer to certain [2, 3] fundamental principles of the law of agency. "An agent has such authority as the principal actually or ostensibly confers upon him" (sec. 7945, Rev. Codes 1921), and, "ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Id. 7947.) It is elementary that a principal who, with knowledge, accepts the benefits of a transaction conducted by an assumed agent, is deemed to have ratified it in toto. (Tiffany on Agency, p. 65; sec. 7940, Rev. Codes 1921; 2 C. J. 493.) "Where a principal accepts a contract made by the agent, he takes it as the agent made it and subject to all equities and defenses arising out of the conditions thereof and the means and instrumentalities by which the agent procured it, even though the agent acted without authority or in excess of his powers." (*United States National Bank* v. *Chappell,* 71 Mont. 553, 230 Pac. 1084.)

From all of the evidence, the question of whether payment for the sheep and Liberty bonds had been made by Grimstad to the bank or to Craig, and whether Craig or the bank acted as the plaintiff's agent in receiving payment was in our opinion a question for the jury.

The rule is firmly established by a long line of decisions [4, 5] by this court that the jury is the trier of facts, and

that no case will be taken from its consideration where the evidence is in conflict as to the material facts. The oft-repeated doctrine enunciated is that a case will not be taken from the jury on a motion for a directed verdict when, from the evidence, reasonable men may draw different conclusions. (*Nord* v. *Boston & Mont. Con. Cop. & Silver Min. Co.,* 30 Mont. 48, 75 Pac. 681; *In re Carroll's Estate,* 59 Mont. 403, 196 Pac. 996; *Pratt* v. *Kistler,* 72 Mont. 356, 233 Pac. 600; *Puutio* v. *Roman,* 76 Mont. 105, 245 Pac. 523; *Dunn* v. *Beck,* 80 Mont. 414, 260 Pac. 1047.) A cause should never be withdrawn from the jury's consideration except where from the undisputed facts the conclusion necessarily follows, as a matter of law, that a recovery cannot be had on any view which may reasonably be taken of the facts established; and it is the duty of the court to submit a case to the jury where there is any substantial evidence to support the plaintiff's complaint. (*In re Carroll's Estate,* supra.)

Here the existence of the indebtedness was established, the payment of which cannot be said to have been proven. As there was substantial evidence that the indebtedness had not been paid, the question of payment or nonpayment was for the jury.

Applying settled principles of law, it is manifest that the court was in error in directing a verdict, and accordingly the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and MATTHEWS concur.

Rehearing denied April 17, 1928.