PANKOVICH, APPELLANT, *v.* LITTLE HORN STATE BANK, RESPONDENT.

(No. 7,582.)

(Submitted March 23, 1937. Decided April 1, 1937.)

[66 Pac. (2d) 765.]

*Mr. Bert W. Kronmiller, Messrs. Rockwood Brown & Horace S. Davis, Mr. Melvin N. Hoiness* and *Mr. Franklin S. Longan,* for Appellant, submitted a brief; *Mr. Davis* argued the cause orally.

*Mr. T. H. Burke* and *Mr. E. E. Collins,* for Respondent, submitted a brief; *Mr. Burke* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an appeal by plaintiff from a judgment in favor of defendant upon a directed verdict. The controversy arose from the following facts:

In August, 1923, plaintiff, whose name was then Gertrude Burks, and her husband, William Burks, owed the defendant bank, according to her statement, $2,700, but, according to defendant's contention, $2,800 plus accrued interest amounting to $75.50, represented by a note and real estate mortgage. William Burks died in 1927, and plaintiff subsequently remarried. About August 1, 1923, plaintiff and her husband entered into a written contract with Bessie Robinson, wherein they agreed to sell and Bessie Robinson to buy a piece of real estate which plaintiff said was her property, but which stood in the name of William Burks. According to the terms of that contract, Bessie Robinson agreed to pay $3,726 (actual computation shows a total of $4,026) for the property in the following manner: $300 on August 1, 1923; thereafter monthly installments for a period of nine years, varying in amounts from $43 per month at the outset to $26 per month for the final payments. This contract was drawn by A. J. Sheets, cashier of the defendant bank, the figures having been submitted by Robinson and Burks, and after it was executed it was left with the bank by Mr. Burks and held by it as security for the indebtedness owing from Burks and his wife to the bank. The contract provided that the payments should be made by Bessie Robinson to the bank. It was understood that the bank should apply the payments on the Burks indebtedness to the bank.

The record shows that Mr. and Mrs. Burks signed the following renewal notes on the dates and in the amounts indicated: November 14, 1923, $2,651.47; November 14, 1924, $2,394.51; December 21, 1925, $2,200; December 21, 1926, $1,850; December 21, 1927, $1,585.17; March 20, 1929, $1,215.21; December 23, 1929, $997.31; December 23, 1930, $706.48; and December 23, 1931, $416.04.

The last six of these renewal notes were introduced in evidence and they all contain indorsements of payments corresponding to the payments required under the Robinson contract for the period involved. The undisputed evidence shows that after each renewal note was signed and delivered to the bank, the prior note was surrendered to the Burks with the indorsements of the payments made thereon. It is also undisputed that the Robinson payments were made in full. It is conceded, however, that the payment of $300 required to be made on August 1, 1923, and which was in fact made at or about that time, was not applied on the indebtedness owing from the Burks to the bank. It is likewise conceded that if the $300 payment should have been applied on this indebtedness, the bank was overpaid and that plaintiff should recover in this action which was brought for that purpose. On the other hand, if the $300 was not received by the bank and, hence, should not have been applied on the indebtedness, and if the original debt was $2,800 instead of $2,700, then, as will be later shown, plaintiff is not entitled to prevail. The original mortgage from the Burks to the bank was introduced in evidence, showing that the indebtedness was in fact $2,800, rather than $2,700, and therefore practically the only question remaining is that relating to the $300 item.

The question before us is whether the court was warranted in granting the motion for directed verdict and taking the case from the jury. This makes it necessary to review the evidence to determine whether there was any substantial evidence to support plaintiff's claim that the $300 payment should have been applied in reduction of the indebtedness due from her and her husband to the bank. The solution of this question obviously depends upon whether the $300 was paid to the bank by the Robinsons, and, if so, whether the bank had the use of it. The evidence bearing upon the issue as to what became of the $300 payment may be summarized as follows:

Plaintiff testified that Mr. Woodley, a brother-in-law of Mr. Burks, made the deal with the Robinsons; that neither she nor her husband received the $300 down payment. She said that

some time in 1933 or 1934, and after the Robinson payments were all made, "I received papers from the bank purporting to state the condition of this account between the bank and Mrs. Robinson. I got those papers from Kersher. He was the assistant cashier of the bank. He brought these papers over to me. He brought them over to see how I stood. Mr. Sheets sent him over. I had had previous talks and discussions with the bank in regard to the balance which I claimed was due." The papers which she received were three yellow sheets of paper containing all of the payments made on the Robinson contract, with the date of each payment, the first of which was a $300 payment made on August 6, 1923. The entries were concededly in the handwriting of Mr. Sheets. On cross-examination she said: "Before I got this Exhibit 1 [being the yellow sheets] I had not had any conversation with the officers of the bank regarding my indebtedness to the bank." Mr. Kersher directed her to return the yellow sheets when she was through looking them over as they were bank records. Plaintiff also testified on redirect examination that Mr. Sheets computed the amount of the renewal notes from time to time, and that she had nothing to do with the computations, and that she did not remember that any explanation of the method of arriving at the figures was given her at the time the notes were presented. She accepted the figures of Mr. Sheets as being the correct amount. On recross-examination she testified: "As to whether I know, myself, whether Mr. Robinson paid the $300 to the bank, he didn't pay it to us. As to whether I want to state of my own knowledge that Mr. Robinson paid $300 to the bank on this indebtedness, I see it in one of these papers of Mr. Sheets' where he said he received $300, right here where he said something about it—it is Mr. Sheets' knowledge. As to whether I know of my own knowledge whether Robinson paid that to the bank and whether applied on these notes or not, I know of my own knowledge. Yes sir, I know Mr. Robinson paid that to the bank on the Burks notes. I know it because this paper said it. This paper is in Mr. Sheets' handwriting. No, sir, outside of that paper I do

not know of my own knowledge anything about the $300 payment. All I know about the $300 payment is what I see on Exhibit 1.''

Mr. Robinson testified that he personally made the payments on the Bessie Robinson contract. Regarding the $300 payment, he said: ''It was either paid to Mr. Woodley or the bank. * * * I am sure in my own mind that I did not make that payment to Mr. Burks himself. I did not make it to Mrs. Burks. * * * I recollect it to be Mr. Woodley or the bank direct.'' He said he thought the payment was made by check, but that he was not able to find the check. He testified that the yellow sheets, Exhibit 1, were attached to the contract, and that, when he made payments to the bank, Sheets would indorse them on the yellow sheets usually in his presence. He further said in speaking of the $300 check, ''I know I gave it to Mr. Woodley or Mr. Sheets, I don't know which. Mr. Woodley was representing Wm. Burks and his wife in the deal.''

Mr. Woodley testified that he did not get the $300 and that it did not pass through his hands in any way. He said he was not connected with the bank at the time of the Robinson transaction.

Mr. Sheets, testifying for the defendant, said that the only portion of the Robinson payments that were to be made at the bank were the deferred payments totaling $3,726, and that this did not include the $300 down payment; that Mr. Burks wanted the use of the $300; and that the $300 payment was not made to the bank. He stated that Exhibit 1, the yellow sheets, represented payments made by Robinson on the contract with the Burks and did not purport to give the payments made to the bank; that Burks told him to indorse the $300 payment on the Robinson contract, but that he, Sheets, did not get the money; that this request was on August 6, 1923; and that Burks paid to him $159.44 at that time, to be applied on the Burks' indebtedness. He said no objection was made to any of the renewal notes. He kept a loans and discounts register, as well as the liability ledger. The liability ledger showing the account of the Burks contains all the payments shown on Exhibit 1, to-

gether with some additional payments. In December, 1932, Sheets wrote a letter to plaintiff, a part of which is the following: "One reason why the payments on the contract did not take care in full of the note, is due to the fact that Mr. Burks had me add the insurance into the new note when renewal notes were drawn up in December. Then back in November, 1923, the indebtedness was increased from $2,511.56 to $2,915.47. If I remember right that was the time he bought the team of greys and asked me to increase the loan to take care of them." In explanation of that statement he said that this difference was brought about because of a certain loan to Mr. Burks in the sum of $264, which was represented by a note signed by Burks and which he later paid out of moneys other than that obtained on the Robinson contract. That this note of $264 was paid out of moneys other than that paid under the Robinson contract is made plain from the liability ledger of the bank, which shows a payment of $99.55 on March 21, 1924, and another of $164.45 paid on May 3, 1924, these payments being other than those provided for and received under and pursuant to the Robinson contract.

Hence we are brought to the determinative question in the case as to whether there was sufficient evidence to show that the bank received and applied to its own use the $300 down payment on the Robinson contract to warrant submission of the case to the jury. It is the plaintiff's contention that, since she testified that neither she nor Mr. Burks got the $300, and since Robinson, who paid the money, testified positively that it was either paid to Woodley or the bank, and since Woodley denied that he received it, the inevitable result, by the process of elimination, is that the bank received the money. The bank, however, with equal emphasis, denied that it received the money, and took the position that the money was received by Mr. Burks. It was developed from the cross-examination of Mr. Robinson that Mr. Burks bought a team of horses about the time of this transaction, and defendant supposes that that is where the $300

went, except the $159.44 which was paid to the bank by Burks on August 6th.

The rule is well established that a case should not be taken from the jury on motion for directed verdict when the evidence is such that reasonable men may draw different conclusions from it. (*Bell* v. *Grimstad*, 82 Mont. 185, 266 Pac. 394; *Claypool* v. *Malta Standard Garage*, 96 Mont. 285, 30 Pac. (2d) 89.) On the other hand, if the evidence is so unsubstantial that it would be the duty of the court to set aside a verdict for plaintiff, if one should be rendered, then it is proper to take the case from the jury. (*Security State Bank* v. *First Nat. Bank*, 78 Mont. 389, 254 Pac. 417, 419; *Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, 127 Pac. 458, 462, Ann. Cas. 1914B, 468.)

The evidence introduced by plaintiff, standing unexplained, ██ ██ made a prima facie case that the bank received the $300 and perhaps raised an inference that it applied the payment to its own use. The question before us is whether, in the light of all the evidence and circumstances in the case, the prima facie showing that the bank received the money or the inference that it applied it to its own use was so completely overcome as to leave no reasonable justification for different conclusions by reasonable men. (Compare *Monaghan* v. *Standard Motor Co.*, 96 Mont. 165, 29 Pac. (2d) 278.)

The written contract with Bessie Robinson provided for the payment of $3,726 to the bank in the manner above stated. In computing the $3,726, the down payment of $300 was not taken into consideration. This is a circumstance indicating that the $300 was not contemplated by the parties as a part of the money that was to be paid to the bank. Mr. Sheets testified positively that it was not to be paid to the bank. Moreover, 107 days from the time this down payment should have been made, the bank submitted to plaintiff and her husband a renewal note to be executed, and which was executed by them in the sum of $2,651. After its execution, the original note with the indorsements of payments made was surrendered to the Burks. It would seem

that if Mr. Burks did not himself receive this $300 he would have then made inquiry as to whether it had been paid by the Robinsons and, if so, why it had not been indorsed on the note and the amount of the renewal note reduced accordingly. He was the one who, according to plaintiff's testimony, transacted all of the business of herself and her husband with the bank. Plaintiff doubtless did not receive the money herself and honestly believed that Mr. Burks did not. The failure of Mr. Burks to raise any protest at the time of signing the first renewal note raises a strong inference that he must have received the $300 himself.

The records of the bank show a payment on the note on August 6th, in the sum of $159.44, which according to the evidence was indorsed upon the surrendered note. The discrepancy between $159.44 and $300 is so apparent on a $2,800 transaction that we are unable to see how it escaped the notice of Mr. Burks. His failure to protest at that time and his signing the renewal note which on its face disclosed that no credit was given for a payment of $300 leads us to believe that there is no room for a difference of opinion among reasonable men that Mr. Burks received the $300 and doubtless from it made the payment of $159.44 on August 6th. Mr. Robinson may have actually paid the $300 to the bank and the bank in turn given it to Burks pursuant to his request that he be permitted to have the use of it as testified to by Mr. Sheets, and which other circumstances tend to support without contradiction.

The trial took place more than twelve years after the $300 payment was made, and no witness was certain as to just how the $300 item was paid or to whom. The plaintiff did not sustain the burden resting upon her to prove by clear and satisfactory evidence that the bank received the $300 and applied it to its own use. The trial court was warranted in granting the motion for directed verdict.

We do not mean to hold that the correctness of the items of an account stated cannot be inquired into and corrected in case of mistake or error. That this may be done is well settled.

(1 Am. Jur., p. 287; 1 C. J. S., Account Stated, p. 733; *Hanson Sheep Co.* v. *Farmers' etc. Bank,* 53 Mont. 324, 163 Pac. 1151.) However, in order to do so, there must be clear and convincing proof that there was a mistake or error. (*Johnson* v. *Gallatin Valley Milling Co.,* 38 Mont. 83, 98 Pac. 883, 884.) Such proof was not presented.

The circumstance that the first renewal note was signed without protest, at a time so close to the time of the inception of the transaction with defendant bank and the Robinsons, taken in connection with other facts and circumstances in the case, refutes the inference that defendant bank received the $300 and applied it to its own use, with such certainty that reasonable minds could not reasonably arrive at different conclusions with respect thereto.

Plaintiff contends that the court erred in admitting the testimony of Mr. Sheets relative to statements made to him by Burks, now deceased. She relies upon subdivision 4 of section 10535, Revised Codes , in support of her contention. Assuming, without deciding, that this statute has application to the facts here, we think the court had the right in its discretion to admit the evidence. It sufficiently appears from the record that without the evidence an injustice might be done. Before the testimony was introduced, the liability ledger was referred to by Mr. Sheets. Plaintiff had testified that all the dealings with the bank for her and her husband were done by her husband, Mr. Burks. The court did not commit error in allowing Mr. Sheets to testify to the conversation with Mr. Burks relative to the $300 item and to give his explanation of the credit of $159.44 on August 6, 1923, appearing on the liability ledger. (Compare *Roy* v. *King's Estate,* 55 Mont. 567, 179 Pac. 821; *Marcellus* v. *Wright,* 65 Mont. 580, 593, 212 Pac. 299, 302; *Wunderlich* v. *Holt,* 86 Mont. 260, 283 Pac. 423, 425.)

The judgment is accordingly affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.