## DUNN, APPELLANT, *v.* BECK, RESPONDENT.

(No. 6,189.)

(Submitted October 18, 1927. Decided November 3, 1927.)

[260 Pac. 1047.]

*Physicians and Surgeons—Malpractice—When not Liable in Damages—Evidence—Insufficiency—Appeal — What Constitutes Conflict in Evidence—Absence of Substantial Conflict— Final Disposition of Case by Supreme Court.*

Physicians and Surgeons—When not Liable in Damages for Alleged Malpractice.
    1. A practicing physician or surgeon is required to possess the skill and learning possessed by the average member of the medical profession, and to apply such skill and learning with ordinary and reasonable care; he is not an insurer nor does he impliedly guarantee a good result; if he exercises such reasonable care and skill in the treatment of a patient as is usually exercised by physicians or surgeons of good standing, of the same school of practice in the community in which he resides, with due regard to the condition of the patient and the progress of medical or surgical science at the time, he is not liable in damages for malpractice because of a bad result; nor is he liable for injuries arising, without negligence, from honest errors.in judgment.

Same—Need not Employ Any Particular Method of Treatment.
    2. A physician is not bound to employ any particular method in the treatment of a patient for a given ailment, and where among physicians of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence if he adopts either one of such methods, and the mere fact that other physicians would have used a different method in the particular case is not proof of negligence.

Same—Malpractice—Evidence—Insufficiency.
    3. Evidence in an action for malpractice against a physician with twenty-five years of experience in the practice of his profession, who was charged with negligence in the treatment of a compound spiral comminuted fracture of a leg and discharged from the case after but nine days of attendance, much of which time was properly devoted to combating infection, *held* insufficient, under the above rules of law, to go to the jury.

Appeal—Rule That Verdict Based on Conflicting Testimony will not be Disturbed is Applicable, Only When.
    4. The rule that a verdict returned upon conflicting evidence approved by the trial court by its order denying a new trial

---

    1. General rules as to liability of physician or surgeon for malpractice, see notes in 48 **Am. Dec.** 481; 59 **Am. Dec.** 397; 59 **Am. Rep.** 392; 93 **Am. St. Rep.** 657; 1 **Ann. Cas.** 21, 306; 14 **Ann. Cas.** 605; 37 **L. R. A.** 830. See, also, 27 **R. C. L.** 381.
    2. See 21 **R. C. L.** 383.

[80 Mont. 414.]

will not be disturbed on appeal if there be substantial evidence to support it, has reference to real conflicting statements in testimony given by opposing witnesses, and not to conflicting statements by a party's own witnesses.

Same—Where No Substantial Conflict in Evidence, Case to be Viewed as One Submitted on Agreed Statement of Facts and Supreme Court will Make Final Disposition.

5. Where there is no substantial conflict in the evidence, the function of the trial court is to determine the law applicable to the evidence viewed as an agreed statement of facts, and on appeal the supreme court is in as favorable a position as the trial court to make such determination, and will make final disposition of the cause. (Sec. 8805, Rev. Codes 1921.)

---

[1, 2] Physicians and Surgeons, 30 **Cyc.**, p. 1570, n. 19, p. 1575, n. 53, 54, p. 1578, n. 91.
[3] Physicians and Surgeons, 30 **Cyc.**, p. 1588, n. 83.
[4] Appeal and Error, 4 **C. J.**, sec. 2841, p. 866, n. 52.
[5] Appeal and Error, 4 **C. J.**, sec. 2830, p. 845, n. 82; sec. 3224, p. 1187, n. 89.

*Appeal from District Court, Fergus County; John C. Huntoon, Judge.*

ACTION by J. C. Dunn against Elmer Beck. From a judgment for defendant, plaintiff appeals. Reversed and remanded for a new trial.

*Mr. I. Parker Veazey, Jr., Mr. R. H. Glover* and *Messrs. Cheadle & Cheadle,* for Appellant, submitted a brief; *Mr. Glover* argued the cause orally.

Citing: *Vanhoover* v. *Berghoff,* 90 Mo. 487, 3 S. W. 72; *Lorenz* v. *Booth,* 84 Wash. 550, 147 Pac. 31; *Browning* v. *Hoffman,* 86 W. Va. 468, 103 S. E. 484; *Schumacher* v. *Murray Hospital,* 58 Mont. 447, 193 Pac. 397; *Loudon* v. *Scott,* 58 Mont. 645, 12 A. L. R. 1487, 194 Pac. 488; *Lehman* v. *Knott,* 100 Or. 59, 196 Pac. 476; *Dishman* v. *Northern Pac. Beneficial Assn.,* 96 Wash. 182, 164 Pac. 943.

*Messrs. Belden & DeKalb* and *Mr. Merle C. Groene,* for Respondent, submitted a brief; *Mr. O. W. Belden* argued the cause orally.

To adopt appellant's theory of the law would indeed relieve all physicians or surgeons of any liability, for we can con-

ceive of hardly any case that does not call for the exercise of judgment on the part of the attending physician. We respectfully submit that the gist of the action is negligence and, if negligence is present, it is immaterial whether there was any error of judgment or not. (*Schumacher* v. *Murray Hospital*, 58 Mont. 447, 193 Pac. 397; *DuBois* v. *Decker*, 130 N. Y. 325, 29 N. E. 313; *Moehlenbrock* v. *Parke, Davis & Co.*, 145 Minn. 100, 176 N. W. 169; *Robinson* v. *Crotwell*, 175 Ala. 194, 57 South. 23.) The case at bar, it seems to us, is parallel with the case of *Stokes* v. *Long*, 52 Mont. 470, 159 Pac. 28. In that case the negligence consisted in not using an extension to keep the bones in place. In this case we have exactly the same situation. (See, also, *Hanson* v. *Thelan*, 42 N. D. 617, 173 N. W. 457.)

MR. JUSTICE GALEN delivered the opinion of the court.

This action was begun by the plaintiff, a physician, to recover from the defendant the sum of $150 as the balance alleged to be due for professional services. The defendant answered, admitting the rendition of the services, but denied their value as alleged, and counterclaimed for malpractice, alleging damages sustained by the defendant, in consequence of plaintiff's negligent care and treatment of him, to the extent of $3,000. Upon issue joined by reply the cause was tried to a jury which rendered verdict in favor of the defendant in the sum of $1,500. Judgment was duly entered on the verdict, and an appeal has been prosecuted therefrom. At the close of the testimony offered by the defendant, a motion for a nonsuit as to the counterclaim was interposed by the plaintiff and by the court denied; and at the conclusion of all of the evidence the court denied plaintiff's motion for a directed verdict on the defendant's counterclaim. After the entry of judgment, a motion for a new trial was made by the plaintiff and by the court denied.

The only question presented for determination is whether the evidence is sufficient to support the verdict and judgment.

It appears that the plaintiff, J. C. Dunn, is a physician and surgeon, regularly licensed to practice medicine in the state of Montana. He is a graduate of Northwestern University, and has had twenty-five years' experience in the practice of his profession. He is a resident of the city of Lewistown, and has there been engaged in general practice as a physician and surgeon for the last sixteen years. On the afternoon of April 8, 1925, in the city of Lewistown, the defendant was driving a four-horse team hitched to a wagon, when the team became frightened and ran away. He was thrown from the wagon, but held to the lines, and was dragged along the road for a distance of about seventy-five yards, sustaining serious bodily injury. While lying on the roadside he sent for the plaintiff, who was his family physician. A few minutes later the plaintiff arrived upon the scene of the accident and had the patient removed to St. Joseph's Hospital in Lewistown, where, upon examination made with the aid of X-ray pictures it was found that the defendant suffered a compound spiral comminuted fracture of the lower third of the femur bone of his left leg, and a compound fracture of the lower third of the humerus bone of his left arm. By compound fracture is meant one where the bone has been broken and protrudes through the surface of the skin; a spiral fracture is one which is uneven, and a comminuted fracture is one where the broken ends of the bones are shattered.

The arm fracture was about one inch above the elbow and was oblique in character, extending upward and backward, and that of the leg was about four inches above the knee-joint. Immediately after having made an examination of the extent of the injuries, the patient was placed in a fracture bed, especially provided for such cases in the hospital, his wounds were cleansed, and the broken arm was placed in extension vertically from his body as he lay on his back in the bed, and was held in place by means of a rope passed through a pulley attached to an iron bar above the bed with weights suspended from the rope. His leg was put into a

Thomas splint, and extension thereof was maintained either by the use of weights or by means of a torque. The Thomas splint is made of steel bars attached to a large ring of iron. The ring is made to fit the groin, and the steel bars extend down therefrom a distance beyond the foot where they are joined. Because of the character of the fractures and dirt ingrained into the wounds, there was grave danger of infection. During the first few days the patient had a temperature of 102 or 103 degrees, and his wounds in the vicinity of the fractures were swollen, red and feverish. Being afraid of blood poisoning, the doctor scrubbed and cleansed the wounds, applied antiseptics and wet dressings, and administered anti-tetanus serum. He stated that he concluded the most important thing to be done at the outset was to clear up the infection, and that his efforts were principally directed toward that end for the first week, or until April 15. He was fearful of moving the patient from the bed into the X-ray room for the purpose of securing additional pictures to assist him in getting the broken bones in apposition for properly setting them, and concluded it most desirable to utilize a portable X-ray machine so as not to have to move the patient. As there was no such instrument in Lewistown, he sent to the city of Butte for one and had it transported to him by automobile without delay. With it he took several pictures of the arm and of the leg on April 15, and having then concluded that there was no longer danger of infection, put the broken bones in apposition as well as he could and set them, using the Thomas splint with torque extension on the leg, and a Jones right angle splint on the arm. All expert witnesses appear to be agreed that the Thomas splint is an approved method of treating such a fracture of the leg, either by the use of weights or a torque for extension; and the method employed in treating such a fracture of the arm is also recognized and approved.

On April 17, because of the pain then suffered by the patient, Dr. Dunn says: "After a few hours I knew that I

must have caught an important nerve over the ends of the fractured bones. * * * I immediately set about to find a means of correcting that, and hit upon the method which is universally recognized as correct, the double inclined plane with the extension from the lower end of the femur by ice tongs—what we call calipers or ice tongs. * * * I made up my mind that was the proper thing to do, and I was then making arrangements to get the apparatus." On that date, by the use of his portable machine, he took X-ray pictures of the fractures, showing the bones to be in an end to end position, which, if maintained, should have permitted very satisfactory results. The next morning, April 18, at about 7 o'clock, Dr. Dunn was discharged from further attendance upon the case. From the time of the removal of the defendant to the hospital until Dr. Dunn was discharged, the latter visited his patient every day, and as often as two or three times daily. On April 18, Dr. Porter was employed on the case and on that day he summoned his partners, Dr. Deal and Dr. Biddle, to the hospital in consultation and to render assistance. Thereupon the patient was moved from his bed and the room he had been occupying to the X-ray room of the hospital. He was placed on the movable top of the hospital cart, and thus transported to the X-ray room and back to his bed. Thereupon X-ray pictures were taken of his leg and arm under the direction of Dr. Porter. The pictures so taken show a great displacement of the bones of the leg and an overlapping thereof of about two inches. The condition as depicted by these pictures of the leg are in great contrast with those taken the day before by Dr. Dunn. These X-ray photographs have been certified to this court and have been by us compared and examined in connection with the record. The defendant spent several weeks in the hospital under the care of Dr. Porter, and since his discharge X-ray pictures taken by Dr. Porter, before us, show about one and a half inches of overlapping of the bones, and his left leg is about one and a half inches shorter than the other.

It is agreed by all expert witnesses that medical authority supports the practice of getting possible infection under control before setting such fractures. Binney, a recognized authority on surgery, states that in case of a compound fracture possible infection must first be combated, and that reduction of the bones is of secondary consideration, and should not be made until the eighth day. Such was the course pursued by Dr. Dunn. Dr. Porter, as a witness for the defendant, says that in spite of approved methods of treatment a certain per cent of fractures of the femur result in a shortening of the leg, and it does not always make a difference whether the doctor is an orthopedic specialist.

There was a conflict of evidence, but, in our view of the case, it is of no consequence in application of the law to the facts. The following *résumé* will indicate the character and extent of such conflict. Dr. Dunn testified that when he examined the defendant on the roadside before the patient was removed to the hospital he administered morphine to alleviate the pain then suffered by Beck. The defendant states that he was not given morphine until after he reached the hospital. Dr. Dunn testified that the fractures were compound, while Dr. Porter says that while the patient had a daily temperature of from 100 to 102, thus indicating infection, yet that he and his associates "could discover no evidence that the bones had projected through the flesh and through the outer skin," when they examined the patient ten days after his injury.

There is a dispute as to whether Dr. Dunn employed the torque method or weights to secure an extension of the leg; however, it is agreed that he employed one or the other of such processes. Dr. Porter stated that "there was evidence that traction had been applied." Dr. Dunn did not palpate to determine the position of the bones. He testified: "Palpation was useless in this case; you could not feel the ends of the bones"; and that such was the condition on the evening of April 17. "Aside from what was disclosed by my X-rays

[80 Mont. 414.]

I could not tell anything about the condition of the fragments of the bones, nor could anybody else.'' Dr. Porter testified that X-ray pictures were used only to check the results obtained from a physical examination. He states that in using ordinary methods of palpation the fracture of the leg was immovable. He testified: ''We first discovered that fibrous union had taken place in the fracture of the left leg * * * when we put him back into bed on the morning of the eighteenth. The arm was in a Jones right-angle splint. * * * We could move the fragments in the arm.'' Other expert testimony is to the effect that no fibrous union of such fractures ever occurs within the first week or ten days after such an inquiry. Dr. Dunn testified that on the 15th of April he reduced the fractures of both the arm and the leg, securing end to end apposition of the bones; however, Dr. Porter expressed opinion that this could not have been done in consequence of the condition in which he found the bones on the eighteenth. There was a dispute in the evidence as to whether the foot of the bed was elevated during the first week of the patient's treatment, but this is inconsequential, in view of evidence that it is recognized as proper to treat such a case without elevating the bed or the leg.

We have made a careful study and review of all of the evidence in light most favorable to the defendant, with a view to sustaining the judgment, but in a correct application of the [1, 2] law to the facts such result cannot be accomplished. The law requires a physician or surgeon to possess the skill and learning which is possessed by the average member of the medical profession in good standing, and to apply such skill and learning with ordinary and reasonable care. He is not an insurer, nor is a good result impliedly guaranteed. His obligation is merely to exercise such reasonable care and skill in the treatment of the patient as is usually exercised by physicians or surgeons of good standing, of the same school of practice in the community in which he resides, with due regard to the condition of the patient and the progress of

medical or surgical science at the time. (*Hansen* v. *Pock,* 57 Mont. 51, 187 Pac. 282; *Loudon* v. *Scott,* 58 Mont. 645, 12 A. L. R. 1487, 194 Pac. 488; *Wilson* v. *Blair,* 65 Mont. 155, 27 A. L. R. 1235, 211 Pac. 289.) "This rule is elementary and has its foundation in most persuasive considerations of public policy. Its purpose is to protect the health and lives of the public, particularly the weak and credulous, the ignorant or unwary, from the unskillfulness or negligence of medical practitioners liable to respond in damages for the results of their unskillfulness or negligence." (21 R. C. L. 379; *Hansen* v. *Pock,* supra.)

The undertaking of the physician is not to cure the patient, nor to insure that his treatment will be successful, but rather that he will treat the injury he is employed to treat with ordinary care, diligence and skill. His obligation requires only that he shall in his treatment employ such a degree of skill and diligence as surgeons practicing in the general neighborhood, pursuing the same line of practice, ordinarily display in like cases. (*Harvey* v. *Richardson,* 91 Wash. 245, Ann. Cas. 1918A, 881, 157 Pac. 674.) He is not necessarily liable for malpractice because of a bad result. Often he must act promptly and exercise his best judgment, and he is not liable for injuries arising without negligence, from honest errors in judgment. (*Moehlenbrock* v. *Parke, Davis & Co.,* 145 Minn. 100, 176 N. W. 169.) Nor is a physician bound to employ any particular method in the treatment of a patient, and, where among physicians of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician to adopt either of such methods. The mere fact that there are other methods of treatment than the one employed, or the fact that other physicians would have used or advised the use of a different method in the particular case, is not proof of negligence. (*Schumacher* v. *Murray Hospital,* 58 Mont. 447, 193 Pac. 397.) The rule was very well and succinctly stated by Mr. Justice Hurly, speaking for this court in the case of *Schumacher* v. *Murray Hos-*

*pital,* supra, as follows: ''Nor does the fact that other physicians might have adopted other methods necessarily render the attending physician liable, nor show negligence or want of skill or care. If the method adopted * * * has substantial medical support, it ·is sufficient. * * * And, where there is a difference of opinion among practical and skillful surgeons as to the practice to be pursued in certain cases, a physician may exercise his own best judgment, employing the methods his experience may have shown to be best, and mere error of judgment will not make him liable in damages, in the absence of a showing of want of care and skill.''

Applying these fundamental rules of law to the facts, it is
[3] plain that the verdict is against the law, and therefore the judgment cannot be permitted to stand. It will be remembered that plaintiff had attended the defendant but nine days when he was discharged, much of the time being properly devoted in combating infection. The means employed in the treatment of the patient and caring for the fractures are recognized methods employed by other physicians in the community of the same school in the treatment of similar fractures, and the final result, of which complaint is made, occurred subsequent to the plaintiff's discharge from the case, and there is no evidence upon which to predicate the plaintiff's responsibility therefor. The evidence is wholly insufficient to establish negligence on the plaintiff's part in the care and treatment of the case during the period of time the patient was under the plaintiff's care.

The jury were by the court correctly instructed as to the law, as follows: ''You are instructed that the law requires that a physician or surgeon in treating a case possess the skill and learning which are possessed by the average member of the medical profession in good standing in the community in which he resides, and that he apply that skill and learning with only ordinary and reasonable care. He does not become a guarantor of the results of such treatment. If, therefore, in this case the defendant, Beck, has failed to establish by a

preponderance of the evidence that Dr. Dunn did not possess such skill and learning, as aforesaid, or did not apply such skill and learning with ordinary or reasonable care, your verdict as to defendant's counterclaim must be in favor of the plaintiff, Dr. Dunn, and against the defendant.'' However, such instruction was entirely disregarded, and the verdict cannot be permitted to stand. Upon the facts, this case is to be distinguished from that of *Stokes* v. *Long,* 52 Mont. 470, 159 Pac. 28. Each case must be determined upon its own peculiar facts.

In the *Long Case,* Mr. Chief Justice Brantly, reviewing the evidence, pointed out that the evidence disclosed that in the treatment of the patient ''no X-ray pictures were taken,'' and that several physicians, who either heard the testimony in the case or had it submitted to them in the form of hypothetical questions, ''expressed the opinion that the treatment was vicious, in that it was not such as reasonable knowledge of the surgical art and ordinary care and skill in its practice require.'' Because of the character of the evidence in that particular case, the court stated that, ''after making a careful study of it, we have concluded that it presents a case calling for the judgment of the jury.'' And in the case now before us we have made like careful study of all of the evidence, and have arrived at a contrary conclusion.

Upon the completion of all of the evidence in the case, the court should have sustained the plaintiff's motion for a directed [4] verdict upon the defendant's counterclaim. The rule that a verdict returned upon conflicting evidence, approved by the trial court by its order denying a new trial, will not be disturbed on appeal, if there is substantial evidence to support it, has reference to real conflicts arising in substantial testimony introduced by a party and that given by opposing witnesses, and not to conflicting statements made by his witnesses. (*Casey* v. *Northern Pac. Ry. Co.,* 60 Mont. 56, 198 Pac. 141.) And where the evidence submitted to a jury in the trial of a case is such that reasonable men can come to but one con-

[80 Mont. 414.]

clusion, the court may direct a verdict, or withdraw the case from the jury and render judgment as the case may seem to require. (*Milwaukee Land Co.* v. *Ruesink,* 50 Mont. 489, 148 Pac. 396.)

There being no substantial conflict in the evidence, it re-
[5] mained only for the court to determine the law applicable to the evidence viewed as an agreed statement of facts (*Milwaukee Land Co.* v. *Ruesink,* supra), and on appeal we are in as favorable a position as the trial court to make such a determination. Since the evidence respecting the defendant's counterclaim is all before us, and we do not find substantial conflict therein, it does not appear that there is anything further to be litigated with respect thereto, and it becomes our duty to make such directions to the trial court as may aid it in a final determination of the controversy. (Sec. 8805, Rev. Codes 1921; *Bielenberg* v. *Eyre,* 44 Mont. 397, 120 Pac. 243.)

The judgment is reversed and the cause remanded to the district court of Fergus county, with directions to dismiss the defendant's counterclaim, and to proceed to trial upon the issues joined by the plaintiff's complaint and the defendant's answer thereto.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and MATTHEWS concur.

Rehearing denied November 25, 1927.