(No. 5945.   March 23, 1934.)

CLYDE W. NASH and JEAN NASH, Husband and Wife, Respondents, v. JOHN S. MEYER, Appellant.

[31 Pac. (2d) 273.]

W. A. Stone and Cleve Groome, for Appellant.

Harry S. Kessler and Hugh N. Caldwell, for Respondents.

GIVENS, J.—Respondents' complaint alleges in substance that appellant a physician and surgeon, either knowingly, falsely *and* unlawfully or negligently and carelessly induced Mrs. Nash to have an abortion performed, as necessary to save her life, when in fact it was not necessary; also, that the operation was negligently performed and that appellant failed and refused to give Mrs. Nash treatment or care when her consequent condition required it, and asks for damages because of the negligent and/or illegal abortion and, for the loss of her health and probable inability thereafter to have other children, and for the loss of the companionship, etc., of the intercepted child, wounded sensibilities and mental anguish and for the amounts spent by respondents for medical care and hospitalization occasioned by her consequent condition.

Appellant interposed a general denial.

The evidence produced ·by respondents proceeded along the line of showing that the abortion was not necessary to save Mrs. Nash's life; and though scant that the actual performance of the abortion was negligent; that by failure to give Mrs. Nash medical attention subsequent to the operation a condition arose or continued, which, either because of direct contamination from the operation or infection from the after effects of the abortion, or because of an indirectly aroused latent condition resulted in an abscess forming upon

the broad ligament, which necessitated two blood transfusions; an operation for the removal of the abscess; and a rather protracted period of convalescence.

The evidence on behalf of appellant sought to establish that the operation was necessary, that it was performed without negligence, and that the abscess on the broad ligament might have resulted from causes other than those connected with the abortion or negligence in connection therewith or failure of the appellant to, after the abortion, give Mrs. Nash medical or surgical attention; and that under his contract of employment appellant was not obligated to give her treatment except at his office in Caldwell, respondents residing in Boise and failing or refusing to go to Caldwell.

The issues and evidence, and appellant's and respondents' respective positions as to the applicable law thus present these respective contentions.

First, that respondents were fraudulently induced by appellant's false statements to consent to and have Mrs. Nash submit to an illegal abortion in consequence of which the defendant would be liable for all injuries resulting from the operation, negligent, or not, that is, the performance of the illegal abortion was negligence *per se* and hence he would be liable from the mixture of fraud, deceit and illegal act, and likewise liable for any actual negligence, and results therefrom reasonably foreseeable or otherwise.

Second, that the plaintiffs wanted and were willing to have an illegal abortion, and thought that was what was being performed and that defendant likewise knew it was illegal. In this event two conclusions are open, one, that all being cocriminals, no recovery can be had, as urged by appellant, the other that an exception exists in abortion cases and the woman may, notwithstanding her criminal complicity, recover, as urged by respondents. In the first alternative the question of negligence becomes immaterial, in the latter, does the recovery result from the negligence only in the performance of the operation, or from the abortion if the operator was guilty of no negligence?

Third, that the appellant guilty of no deceit honestly believed though mistakenly and/or negligently that the abortion was necessary and so advised respondents; or that it was in fact necessary in which events, the rule of responsibility would be the same as in the case of any legal operation, only for actual negligence as distinguished from statutory, and for foreseeable probable injurious consequences.

The sole grounds for reversal are based on instructions given and refused.

First, the appellant urges that the court erroneously instructed[1] that the appellant would be responsible for negligence even though the respondent Mrs. Nash knowingly and intentionally consented to a criminal abortion, on the theory that one who participates in, or consents to, an illegal act may not recover damages in a civil suit, and that the court erred in refusing an instruction offered that such consent if so given would be a bar to recovery.[2]

As to respondents' desire for and consent to an illegal abortion, in their case in chief they took the position and produced evidence to show that either the abortion was illegal, or negligently diagnosed as necessary, or negligently performed, and that if the operation was illegal they did not know it or consent to it as such, and consented to the operation only on the theory that it was a legal abortion, necessary to save Mrs. Nash's life, so represented to them by

[1] "You are instructed, Gentlemen of the Jury, that if the plaintiffs of their own volition and not being induced so to do by the counsel and advice of the defendant, requested the defendant to perform the abortion upon the plaintiff Jean Nash, and that the defendant performed such operation, using ordinary care, skill and diligence, as defined in these instructions, or if you find that it was necessary to perform an abortion upon the plaintiff, . . . . you should find for the defendant."

[2] "Gentlemen of the Jury, you are instructed that if the plaintiffs came to the defendant to secure an illegal operation to be performed upon the plaintiff, Jean Nash, and if the defendant performed an illegal operation upon the plaintiff Jean Nash, pursuant to such request the plaintiffs would have broken the law and the court of law will not assist either party and the plaintiff cannot recover and you shall find for the defendant."

appellant, and they attempted to show that it was not necessary and that appellant deceived them and falsely made them so believe, either because of his negligence in diagnosis, in stating the performance of the operation was necessary, or wilfully performing it, knowing that it was not necessary.

The appellant in his case in chief sought to show that the operation was necessary, and also, that the respondents came to him and wanted the operation, not because it was necessary to save Mrs. Nash's life, but, because they did not want the child, because they had three others, one by Mr. Nash's former wife and that they were financially unable to support another child.

While perhaps such are seemingly inconsistent positions, their presentation is justified and held permissible in *Higgins v. McCrea,* 116 U. S. 671, 6 Sup. Ct. 557, 29 L. ed. 764, involving an illegal contract where consent and illegal participation as bars to recovery were considered. The court saying:

"If, therefore, the defendant (respondents herein) intended to embark his money (consent to) in an illegal and criminal venture, we do not see how his (their) case is helped by the fact that the purpose of the plaintiffs (appellant) was to invest the money so advanced in what they understood to be a lawful and innocent transaction."

Applying that standard to the facts of the case at bar, that appellant considered he was performing a legitimate operation would not defeat him from claiming as a defense, that the plaintiffs considered they were knowingly and voluntarily consenting to an illegal operation, and *Higgins v. McCrea, supra,* has thus been applied in a civil action for damage growing out of an abortion. (*Hunter v. Wheate,* 289 Fed. 604, 53 App. D. C. 206, 31 A. L. R. 980.)

The basis for considering that respondents and particularly Mrs. Nash, voluntarily consented to an illegal operation uninfluenced by appellant, is, the circumstance that though living in Boise, respondents, while on a business (husband's) trip to Payette, at least suspecting that Mrs. Nash was pregnant, without previous thought in regard to an abortion,

without knowing appellant or ever having heard of him before, just because Mrs. Nash felt ill, seeing appellant's sign on the street, went to his office and immediately the question of having an abortion performed arose; and this evidence:

Cross-examination of the respondent Clyde Nash.

"Q. Now did you state to Dr. Meyer at that time, in substance that you had come to him to have this pregnancy upset, or aborted—

"A. No, sir."

Direct examination of the appellant.

"A. In getting the history of the case they said they had three children to take care of, and as I remember it, it took about all they could do to support them children, to clothe, support and send them to school and they could not afford very well to have another baby, and in looking her over, she was about two months pregnant; she was not very far."

Cross-examination of appellant.

"A. They said that they had three children and it kept them busy to take care of them, from the time they educated them, clothed and fed them, they had their hands full, and I don't deny it, they certainly did. . . . .

"Q. Now, Doctor, you said that, gave as a reason—that they gave as a reason, that they had all the children that they could care for without having more?

"A. Yes, sir. . . . .

"Q. Anything else?

"A. And the child not wanted.

"Q. Was that any reason for making it necessary to save her life because the child was not wanted?

"A. Yes, she had those children to look after. . . . .

"Q. Quoting from the same author; Doctor, I will ask whether you agree or disagree with this statement: 'Her statements are entitled to but little weight and the decision to interfere should be based entirely upon the objective symptoms and conditions.'

"A. No, I don't.

"Mr. Groome: We object to that as incompetent, irrelevant and immaterial; not proper cross-examination of the witness.

"The Court: He may answer.

"A. I answered, no.

"Mr. Caldwell: You answered, no.

"A. Yes. I consider an individual has her rights.

"Q. You mean you disagree with the author?

"A. Yes, I do; in other words you don't give the individual any rights at all."

Redirect examination of appellant.

"Q. Doctor, you didn't call in any other physician at this time, did you?

"A. No.

"Q. Why didn't you?

"A. Because the folks seemed to know just what they wanted and I didn't think it was necessary in the first place, and in the second place, I don't care to advertise any such things too much, and extra expense."

Direct examination of respondent Clyde Nash on rebuttal.

"Q. Mr. Nash, in your conversation with Dr. Meyer at his office on June 5, 1931, was there anything said about you and Mrs. Nash not wanting any more children?

"A. No, sir."

Direct examination of Mrs. Nash on rebuttal.

"Q. Mrs. Nash, in your conversation with Dr. Meyer in his office on June 5, 1931, was anything said about you and Mr. Nash not wanting any more children?

"A. Absolutely not."

This showing while meager might legitimately lead the minds of reasonable men sitting as jurors to the inference that respondents themselves sought and consented to an illegal operation; the case was tried and instructions given and refused on the theory that the question of voluntary consent was an issue; and both parties argue the question here, hence it is a phase of the controversy which must be disposed of and requires an answer, to, what is the correct rule when a husband and wife seek to recover damages for

an illegal abortion performed upon the woman to which both husband and wife consented?

Respondents in support of their position and the claimed exception rely on the following authorities:

*Hancock v. Hullett*, 203 Ala. 272, 82 So. 523, which case did not consider allowing recovery by a mature woman who had consented to an illegal abortion, but merely held, that a minor female could not consent to such an illegal operation and therefore that her father under a special section of the Alabama Code (sec. 2484, Code of Alabama, 1907, giving him generally the right to sue for an injury to his minor child) could bring suit for an illegal abortion performed upon his minor daughter.

In *Milliken v. Heddesheimer*, 110 Ohio St. 381, 144 N. E. 264, 33 A. L. R. 53, the court flatly lays down the rule as an exception in abortion cases, relying for support of such doctrine, upon cases of battery or mutual combat, where, recovery was allowed in civil actions, 5 C. J. 630, note 31, and expressly declines to follow the Kentucky case of *Goldnamer v. O'Brien*, 98 Ky. 569, 33 S. W. 831, 56 Am. St. 378, 36 L. R. A. 715, recognizing however, that there is a conflict in the authorities. The action appears to have been brought by the administrator of the deceased on behalf of the surviving husband and children. It is apparent that one ground of negligence was that the physician kept the family in ignorance that the wife was suffering from septicaemia or blood-poisoning thereby preventing them from securing other medical attention for her. It appears from the reported case that the husband was apparently in ignorance of the operation and consequently had not consented thereto.

The Milliken case therefore, would not necessarily be controlling here, because herein there is as much evidence, though meager, that the husband consented as there is that the wife did. The reason of the rule or exception announced in the opinion is based on this statement in 1 Cooley on Torts, 3d ed., p. 282 (1 Cooley on Torts, 4th ed., sec. 97):

" 'But in case of a breach of the peace it is different. The state is wronged by this, and forbids it on public grounds. If men fight, the state will punish them. If one is injured, the law will not listen to an excuse based on a breach of the law. There are three parties here, one being the state, which, for its own good, does not suffer the others to deal on a basis of contract with the public peace. The rule of law is therefore clear and unquestionable, that consent to an assault is no justification. . . . . The exception to this general rule embraces only those cases in which that to which assent is given is matter of indifference to public order.' "

The opinion there says:

"If, then, consent will not avail as a defense in any civil suit for damages for personal injury, certainly no argument is required to demonstrate that an act which is designed to take the life of one, and necessarily endanger the life of another, and is violative not only of good morals, but of the criminal laws of the state, is not one from the consequences of which he who commits the act may be relieved by reason of the previous consent of the person injured."

There is this distinction between the purpose of the anti-abortion statute, and assault and battery, dueling, etc., the abortion statute is not designed for the protection of the woman, *Herman v. Julian,* 117 Kan. 733, 232 Pac. 864, only of the unborn child and through it society, while the assault and battery, dueling, and etc., statutes are designed for the direct protection of the individuals concerned, so the exception must rest not on the tender care or protection of the statute for the woman, but, generally, that an illegal act is inherently fraught with danger to the life, health and safety of the individual. But neither does the opinion in the Milliken case, nor the evidence herein show that there is more danger in the case of an illegal than a legal abortion.

If it be argued that an illegal operation is fraught with greater danger to the life or health of the woman than a legal operation because the doctor knows that he will not be held liable for any negligence and therefore damages not be recoverable, the very statement of the proposition defeats

the purpose, since, if damages be allowed such source of added danger, i. e., freedom from liability for negligence, is thereby removed.

The Kentucky case, *Goldnamer v. O'Brien, supra,* criticised in the Milliken case, though in considering the same question it comments on the text of, Cooley on Torts, referred to by the Ohio court, arrives at exactly the opposite conclusion, saying:

"These authorities seem to be irreconcilable. While we readily appreciate the argument that, so far as the state is concerned, no consent can be pleaded in justification, we have not been able to understand how, in a civil suit, in which the party consenting alone is interested, compensation can be allowed by the law. If both parties to the action are violators of the law, must the mouth of one be closed, and the complaint of the other heard? The parties stand on an exact equality before the law, and, if one wrongfully consented to beat another, the other as wrongfully consented to be beaten.

"In a late work on this subject it is said:

" 'Harm suffered by consent is not, in general, the basis of a civil action: . . . . If the defendant is guilty of no wrong against the plaintiff, except a wrong invited and procured by the plaintiff for the purpose of making it the foundation of an action, it would be most unjust that the procurer of the wrongful act should be permitted to profit by it.' (1 Jaggard on Torts, 199.)

"In *Duncan v. Commonwealth,* 6 Dana (Ky.), 295, (1838), the defendant, to an indictment for an affray, pleaded a former conviction under an indictment for an assault and battery, and this court said: 'As an affray is a disturbance of the public peace by a fighting with the mutual consent of the combatants, it would be intrinsically improbable that a conviction for an assault and battery— which would not be authorized unless there had been a trespass without the consent of the person injured—had been adjudged as a punishment for an act which should be deemed an affray.'

"And while in that case, and the quotation from Roscoe as well, the law in criminal cases was being considered, and the rule as laid down is not now followed, the authority strongly tends to support the principle that at least the party consenting to the injury cannot profit by his wrongful act.

"The instruction, therefore, asked by the appellants, that, if the plaintiff voluntarily went to Louisville for the purpose of having the alleged abortion performed on her, the law was for the defendants, should have been given."

*Martin v. Hardesty,* 91 Ind. 239, 163 N. E. 610, cited by respondent argues thus:

"At common law, the general rule was that the consent to a tort was a complete shield against civil liability. To this rule there was an exception in the case of 1. A battery; the reason given for the exception was that, because of the state's interest, neither party had the right to agree to a breach of the public peace, or to make any agreement to sacrifice his life or suffer injury to his person; that any such agreement was void.",

and cites the Milliken and other cases, none of which are referred to in the Milliken case, but recognizes by citation and reference thereto decisions to the contrary, including *Goldnamer v. O'Brien, supra,* and holds that consent by the woman is no defense to an action by her legal representative nor would it have been to an action by her against the party who performed the illegal operation.

*Lembo v. Donnell,* 117 Me. 143, 103 Atl. 11, relied on by respondents, without any particular discussion follows, *Miller v. Bayer,* 94 Wis. 123, 68 N. W. 869, holding to the rule as announced in the Milliken and Martin cases, *supra. Miller v. Bayer* and *Lembo v. Donnell, supra,* rely among others upon, *Fitzgerald v. Cavin,* 110 Mass. 153; *Commonwealth v. Collberg,* 119 Mass. 350, 20 Am. Rep. 328, whereas the Massachusetts court itself has laid down the rule that even though the criminal statute of Massachusetts does not make the woman an accomplice with the doctor (in Idaho of course it is made a crime for a woman to consent to a criminal abortion, sec. 17–1811, I. C. A., as well as the

physician, sec. 17–1810, I. C. A.) nevertheless consent by the woman to a criminal abortion prevents her recovering.

" 'No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiffs' own stating, or otherwise, the cause of action appears to arise *ex turpa causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground that the court goes not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.' " (*Szadiwicz v. Cantor,* 257 Mass. 518, 154 N. E. 251, 49 A. L. R. 958.)

In *Miller v. Bayer, supra,* the circumstance that the woman had been raped by force by the son of the man and woman who, later had the abortion operation performed upon her, to prevent a scandal, may have influenced the court in adopting the exception rule.

The above are all the authorities presented by the respondents; we have, however, found the following which might be considered to sustain their position.

Kansas has rather inclined to the exception by holding, *McNeil v. Mullen,* 70 Kan. 634, 79 Pac. 168, that damages may be recovered for injuries received in a mutual combat. Though without referring to *McNeil v. Mullen, supra,* the decisive position thereof or application in cases of illegal abortions is either negatived or at least weakened by, *Herman v. Julian,* 117 Kan. 733, 232 Pac. 864, wherein the court said with regard to abortion:

"The reason for civil liability for statutory rape, consented to, does not obtain, and there is authority *that consent to an illegal operation bars recovery.* See notes 10, 12, and 14 to article, 'Consent as Affecting Civil Liability,' by Francis H. Bohlen, in Columbia Law Review for December, 1924, vol. XXIV, No. 8. See, also, *Milliken v. Heddesheimer,* 110 Ohio St. 381, 144 N. E. 264, 33 A. L. R. 53, 58." (Italics ours.)

If the Kansas court by its reference to the article in Columbia Law Review, *supra,* meant to imply favorable recognition thereof, it would seem to have inclined away

from the exception because Prof. Bohlen therein after exhaustively reviewing the authorities relied upon to allow recovery in battery and abortion cases and tracing such exception from its inception says:

"The majority American view (Prof. Bohlen refers to what we term the exception as the majority American rule and *vice versa*) is based upon an acceptance, without investigation or analysis, of a *dictum* in an English case decided in 1693, which, if intended to apply to civil actions, was justified, if at all, by the nature and function of the action of trespass at that time. Whatever authority this *dictum* may have had when pronounced was destroyed by the change wrought in the action of trespass by the Statute of 5 & 6 William and Mary, c. 12, which abolished the fine payable to the Crown and so removed both the last vestige of the criminal function of the action and the Crown's interest in its result.

"(2) It is not justified by public policy; it is not likely to deter the commission of breaches of the peace. The State has an ample machinery by which to punish such breaches of the peace as it regards as sufficiently important to require punishment. It puts a premium upon criminality by giving to one who has joined in a breach of the peace a remedy for injuries for which he could not recover were he innocent. It is inconsistent with that policy of the law which leaves parties to an illegal transaction where their conduct places them and refuses to enforce obligations arising out of it or to give redress for harm inseparable from it.

"(3) There is no reason or authority for distinguishing between the effect of consent to 'batteries' which are merely offensive or cause trivial harm and consent to 'batteries' which cause more substantial harm, if both are necessary incidents of a breach of the peace. In both cases the consent is to an illegal act. The illegality of the act to which consent is given should either destroy or not destroy the operative quality of the consent, irrespective of whether the act, in addition to being an offense against the State, threatens and causes a merely offensive contact,

some trivial harm or serious bodily injury to the participants."

The underlying authorities cited in respondents' cases above noted rest upon the following doctrine, that in a voluntary fight consent is no defense in a civil action for damages. (*Morris v. Miller*, 83 Neb. 218, 119 N. W. 458, 131 Am. St. 636, 17 Ann. Cas. 1047, 20 L. R. A., N. S., 907; *Lewis v. Fountain*, 168 N. C. 277, 84 S. E. 278; *Lund v. Tyler*, 115 Iowa, 236, 88 N. W. 333); though consent may be shown in mitigation. (*Adams v. Waggoner*, 33 Ind. 531, 5 Am. Rep. 230; *Grotton v. Glidden*, 84 Me. 589, 24 Atl. 1008, 30 Am. St. 413.)

In *Courtney v. Clinton*, 18 Ind. App. 620, 48 N. E. 799, an action for damages for assault with intent to produce an abortion, the court merely held the verdict excessive, where plaintiff voluntarily submitted to three operations (questioned by the court as inherently improbable) and took drugs; and sustained no permanent injury, that in the absence of malice only the actual damages would be allowed.

Opposed to the above the appellant relies upon, in addition to *Goldnamer v. O'Brien, supra, Hunter v. Wheate, supra,* to the effect that: Though sec. 809, Code, is construed so as not to render a woman on whom an abortion is performed, with her consent criminally liable, she was engaged in an immoral act and cannot recover for the negligence of the physician in performing an abortion. This case does not consider the exceptions, but relies on *Higgins v. McCrea, supra; McMullen v. Hoffman,* 174 U. S. 639, 19 Sup. Ct. 839, 43 L. ed. 1117; *Continental Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U. S. 227, 29 Sup. Ct. 280, 53 L. ed. 486; 1 C. J. 958; *The Florida,* 101 U. S. 37, 25 L. ed. 898; *Riggs v. Palmer,* 115 N. Y. 506, 22 N. E. 188, 12 Am. St. 819, 5 L. R. A. 340; *Levy v. Kansas City,* 168 Fed. 524, 93 C. C. A. 523, 22 L. R. A., N. S., 862.

*Martin v. Morris,* 163 Tenn. 186, 42 S. W. (2d) 207, holds that no recovery may be had where the abortion is performed with the consent of the female, being *sui juris;*

and considers the exceptions thus: "There are respectable authorities to the contrary.", relying on, 1 C. J. 313; *Szadiwicz v. Cantor, supra,* and annotation.

*Szadiwicz v. Cantor, supra,* does not permit recovery for death in abortion where the woman consented, even though resulting from negligence, not the mere illegality of the operation, and sets out the contrary authorities. (*Hunter v. Wheate, supra; Levy v. Kansas City, supra; Foster v. Thurston,* 11 Cush. (Mass.) 232; *Roll v. Raguet,* 4 Ohio St. 400, 22 Am. Dec. 759; *Jackson ex dem. Hull v. Babcock,* 4 Johns. (N. Y.) 419.)

In addition to these we have found the following which apparently tend to support the majority rule, and negative the exception: *Androws v. Coulter,* 163 Wash. 429, 1 Pac. (2d) 320, approves the rule refusing recovery if the woman consents to the abortion and considers but repudiates the exception, and relies on: *Holman v. Johnson,* Cowp., pt. 1, p. 362, 98 Eng. Reprint, 1120; *Higgins v. McCrea, supra; Szadiwicz v. Cantor, supra.*

*McNeil v. Choate,* 197 Ky. 682, 247 S. W. 955, holds: If the plaintiff and defendant voluntarily and mutually entered into combat, plaintiff cannot recover in a civil action for assault and battery.

*Lykins v. Hamrick,* 144 Ky. 80, 137 S. W. 852, held an agreement to fight unlawful and therefore refused damages.

*Crawford v. Magnolia Petroleum Co.,* (Tex. Civ. App.) 62 S. W. (2d) 264, holds that, one may so encourage the other in the erection of a nuisance as to be deprived of an injunction, or damages, relying on the Goldnamer case, *supra.*

In *Fristoe v. Boedeker,* 194 Ill. App. 52, appellant and appellee were hunting quail on prohibited land, when appellee shot the appellant in attempting to bag a quail. The court said:

"If appellant and appellee had not been in pursuit of game and if they had not discovered the object of their hunt, this accident would not have occurred. The game was discovered before they entered the premises, and both

appellant and appellee knew it to be on the premises, they were entering in violation of law. Notwithstanding such knowledge they entered and took their positions, as they were in pursuit of game in violation of law. The causative connection between the violation of the law and the injury are complete. The proximate cause of the injury is the failure of the appellant and appellee to permit the quail to retreat to the premises where the law protected them until permission was secured from the persons authorized by law to give it, which the court has no right to presume would have been given. . . . . What the plaintiff must ask, therefore, must be this: That the law will relieve him from the consequences of his disregard of the law; and this, as already stated, it will refuse to do. . . . .

"It cannot be said he was misled into violating the law that he knew appellee could not give him permission to violate. . . . .

"The appellant requires in this case the aid of an illegal transaction to establish his case, and it makes no difference when this appears, if it so appears from the whole evidence the defense is allowed not for sake of appellee, but of the law itself."

Concluding that a peremptory instruction for the appellee was correct.

In *Gilmore v. Fuller,* 198 Ill. 130, 65 N. E. 84, 60 L. R. A. 286, a member of a charivari party was negligently shot by another member and recovery of damages was denied, both being engaged in an unlawful enterprise.

In *Mangum Elec. Co. v. Border,* 101 Okl. 64, 222 Pac. 1002, there was a conspiracy to injure a doctor's reputation, who was mayor of the city, to minimize his influence in support of a bond issue; the doctor was aware of the conspiracy and one of his agents was acting as a conspirator, under the doctor's direction. It was held that the doctor could not recover damages for the act which he participated in through his agent.

In *Smith v. Simon,* 69 Mich. 481, 37 N. W. 548, wherein a fight was mutually agreed upon, there was no evidence

that the injuries received were the result of excessive cruelty, and it was held that the court erred in instructing the jury that they might so find.

In *Galbraith v. Fleming,* 60 Mich. 403, 27 N. W. 581, it was held that if the participants entered voluntarily into the fight plaintiff could not recover, unless the defendant beat him unreasonably or excessively.

The above two Michigan cases were cited in *Morris v. Miller, supra,* as contrary to the exception rule.

From these authorities it is apparent that in the consideration of the question courts have had in mind two principles of public policy:

First, consent to, or participation in, an illegal act usually bars recovery and second, the state has such regard for the life, health and safety of its citizens, that in a civil action for damages for an abortion or battery such principle will prevail over the former and recovery will be permitted.

Lord Mansfield in *Holman v. Johnson, supra,* announced the first as follows:

"No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpa causa,* or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground that the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally in fault, *potior est conditio defendentis.*"

This doctrine has been followed by our court in *Libby v. Pelham,* 30 Ida. 614, 166 Pac. 575, thus:

" 'It is a fundamental rule, however, that rights based on the violation of the law will never be enforced by the courts. . . . . If the court is advised that the transaction is illegal because in contravention of a statute making it a criminal

offense, it is sufficient to justify a refusal to uphold the transaction in any way.' "

And, also, in *McFall v. Arkoosh*, 37 Ida. 243, 215 Pac. 978:

"The contract, being clearly in violation of the regulations governing national forests, no action could be maintained for its enforcement, and respondent being, *in pari delicto* with appellant, under the rule generally followed by the courts could not maintain an action for money paid pursuant to such an agreement."

And, *Clark v. Utah Const. Co.*, 51 Ida. 587, 8 Pac. (2d) 454, as follows:

" 'In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights springing from such contract. In cases of this kind the maxim is *Potior est conditio defendentis.*' "

*Hooker v. Schuler*, 45 Ida. 83, 260 Pac. 1027, did not involve joint participation in the same crime.

With regard to the second, *Herman v. Julian, supra,* held: "The abortion statute is designed for the protection of the general public interest, and not for the special protection of a class, as primary object.", i. e., not for the protection of the woman, but, to discourage abortions because thereby the life of a human being, the unborn child is taken.

It seems the fatal fallacy in giving complete and exclusive recognition to the exception relied on by respondents is that to apply the rule laid down in battery cases, we must assume two false or at least not supported premises, first, that the anti-abortion statute was designed to protect the woman and second, that an illegal abortion is fraught with more danger to a woman than a legal abortion or any other serious operation (there was evidence in the case herein that an abortion, at least of the kind performed herein is considered a minor not a major operation).

While not in an abortion case and in a dissent, nevertheless considering the question of illegal participation the following by Justice Brandeis in *Olmstead v. United States,* 277 U. S. 438, 48 Sup. Ct. 564, 72 L. ed. 944, 959, 66 A. L. R. 376, is pertinent and compelling:

"The door of a court is not barred because the plaintiff has committed a crime. The confirmed criminal is as much entitled to redress as his most virtuous fellow citizen; no record of crime, however long, makes one an outlaw. The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction. It is sometimes spoken of as a rule of substantive law. But it extends to matters of procedure as well. A defense may be waived. It is waived when not pleaded. But the objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself."

There having been presented no reason in law or fact why an illegal abortion is more dangerous than a legal abortion, there is no basis or justification for the exception, consequently instructions Nos. 6, 7 and 8 were incorrect and appellant's requested instruction No. 6 should have been given.

The above disposes of assignments of error 6, 10, 13, 15 and 11. In connection with assignment 11 as will more fully appear hereafter, requested instruction No. 4, should have been given in connection with requested instruction No. 6.

■ No authorities are cited in support of assignments Nos. 7 and 16, nor are they argued in the brief, therefore they need not be considered. (*Harris v. Chapman,* 51 Ida. 283, at 299, 5 Pac. (2d) 733.)

■ ■ Assignments Nos. 2, 3 and 4, involve instructions refused, defining the liability of a physician if he has been merely guilty of negligence in diagnosing an abortion as necessary, or in performing the same. Under the phase of the case as urged by respondents that appellant, knowingly

and wilfully and unnecessarily performed an illegal operation without respondent's consent, and hence is responsible for any and all negligence or injurious results caused by the illegal abortion as such, the instruction was properly refused, 20 R. C. L. 13; 45 C. J. 651, but if the appellant merely made an honest mistake exercising reasonable care, skill and diligence, the first half of the instruction was prejudicially erroneous,[3] and the thought expressed in the instructions numbered 2, 3 and 4, referred to in assignments Nos. 2, 3 and 4, should have been given, but limited to damages for negligent diagnosis, because the court should instruct on appellant's as well as respondents' theories of the case where appropriate instructions are presented.

The court did not err in refusing to give requested instruction No. 5, because it did not require that the doctor should have exercised reasonable care, skill and diligence in foreseeing or reasonably anticipating probable results.

Assignments Nos. 8 and 9 involve instructions refused relative to the contract of employment. One of the respondents' claims of negligence was based upon the failure and refusal of appellant to come to Boise, after the operation and give any treatment to Mrs. Nash.

The appellant requested an instruction to the effect, that if the contract of employment was not that appellant should go to Boise from Caldwell, he would not be liable for negligence in not so going. The instruction should have been given because respondents, in their complaint, set out the contract of employment and no other allegation appears to negative its limited nature.

---

[3] 48 C. J. 1126, n. 63; 48 C. J. 1127, n. 76; 21 R. C. L., sec. 35; *Patterson v. Marcus,* 203 Cal. 550, 265 Pac. 222; *Schumacher v. Murray Hospital,* 58 Mont. 447, 193 Pac. 397; *Wells v. Ferry-Baker Lumber Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A., N. S., 426; *Rayburn v. Day,* 126 Or. 135, 268 Pac. 1002, 59 A. L. R. 1062; *Emerson v. Lumbermen's Hospital Assn.,* 100 Or. 472, 198 Pac. 231; *Lehman v. Knott,* 100 Or. 59, 196 Pac. 476; *Hills v. Shaw,* 69 Or. 460, 137 Pac. 229; *Dunn v. Beck,* 80 Mont. 414, 260 Pac. 1047; *McAlinden v. St. Maries Hospital Assn.,* 28 Ida. 657, 156 Pac. 115, Ann. Cas. 1918A, 380.

"That when the defendant had completed the operation on the said Jean Nash, performed as aforesaid, he directed and advised the said plaintiffs that if, 'things did not go just right' with the said Jean Nash, she should come back and see him for further treatment within the next two or three days".

And the evidence in this respect showed the doctor did not contract to go to Boise and treat Mrs. Nash, but that respondents, if further treatment should become necessary were to go to Caldwell. (48 C. J. 1111, sec. 97; 48 C. J. 1124; 48 C. J. 1129; 48 C. J. 1135, sec. 133; *Zeigler v. Illinois Trust & Sav. Bank,* 245 Ill. 180, 91 N. E. 1041, 19 Ann. Cas. 127, 28 L. R. A., N. S., 1112; *Nash v. Royster,* 189 N. C. 408, 127 S. E. 356; *Gentile v. De Virgilis,* 290 Pa. 50, 138 Atl. 540; *Dashiell v. Griffith,* 84 Md. 363, 35 Atl. 1094; *Nelson v. Farrish,* 143 Minn. 368, 173 N. W. 715; *Noren v. American School of Osteopathy,* 223 Mo. App. 278, 2 S. W. (2d) 215.)

Direct examination of respondent Clyde Nash.

"Q. Let me ask it this way; did the doctor say anything about Mrs. Nash coming back for further treatment?

"A. He said if, as I recall his words, if she did not get along all right, to come back in about three days and that if she wanted to protect herself in the future to come back every month so she would not become pregnant again. . . . .

"A. . . . . He said, well, if she wasn't such a baby she could, and told me if she didn't get along all right within the next three days to bring her down to see him again and not to bother him any more with telephone calls, . . . . "

While the evidence is not explicit as to whether Mrs. Nash was able to make the trip to Caldwell it at least shows she went to Dr. Dedman's office.

Cross-examination of respondent Clyde Nash.

"A. I went to his office before and interviewed him and told him her, Mrs. Nash's condition, and he said to bring her to the office if she were able, if she was not able to he would come out to the house to see her.

"Q. Did he come to the house?

"A. No, sir, he didn't. I brought her down there.

"Q. You told him about her condition and he told you he would take her to the hospital?

"A. He made an examination.

"Q. Where did he make the examination?

"A. At his office.

"Q. You took her to his office?

"A. Yes, I took her to his office."

Direct examination of Mrs. Nash.

"A. He came home and asked me if I was able to go down to the doctor's office, if I was not the doctor would come out and I said I would try and go down to the office, so he helped me dress and put me in a car and took me down to Dr. Dedman's office."

The doctor is not guilty of negligence if by his contract of employment he did not undertake to treat the case until cured, or only give service at his office.

■ Respondents' own authorities recognize that only in the case of a contract for unlimited service must the doctor continue attendance. (*Gillette v. Tucker*, 67 Ohio St. 106, 65 N. E. 865, 93 Am. St. 639; *Schmit v. Esser*, 183 Minn. 354, 236 N. W. 622, 74 A. L. R. 1312; *Bolles v. Kinton*, 83 Colo. 147, 263 Pac. 26, 56 A. L. R. 814; *Stohlman v. Davis*, 117 Neb. 178, 220 N. W. 247.)

■ Assignments Nos. 12 and 14, involve instruction No. 7,[4] which was given, and requested instruction No. 10,[5] which

---

[4] "In connection with the last preceding instruction, you are instructed that if you find that there was a latent or dormant infection in the female organs of said Jean Nash and that said latent or dormant infection was disturbed and made active by the abortion operation performed by the said defendant, and that said infection when so disturbed developed into an infection which caused the injury to the said Jean Nash, then you are instructed that the act of the said defendant in performing the operation constituted the proximate cause of said active infection causing said injury." . .

[5] "The jury is instructed that a physician and surgeon called upon only for a specific occasion or service is under no duty to go to a distant place to continue treatment thereafter, and if you should find

was refused, defining the appellant's liability for arousing a latent or dormant infection or negligently not foreseeing that it would be so aroused.

Respondents urge that there was no latent defect but that the abscess was the result of direct infection.

Appellant urged and introduced evidence to the effect that the abscess was not caused directly or by any direct infection ensuing from the operation.

Though the jury might have found that the appellant knowingly performed an illegal operation and deceived respondents into consenting thereto, they likewise might have found that the doctor was merely negligent in diagnosis or in operating and therefore, appellant was entitled to such instructions as apply generally to actions for negligence in cases of this kind. (45 C. J. 913–918.)

Respondents herein urge that the requested instruction in fact dealt with proximate cause and not negligence, therefore, the assignments are not well taken, but, while it is true that this subject matter is generally considered to come within the scope of proximate cause, the one so merges into the other that such classification is not sufficient to preclude consideration of the instruction presented by appellant. (45 C. J. 657, n. 5.)

Respondents further urge in connection with this matter that one guilty of a crime is responsible for all consequences. (45 C. J. 653, sec. 26; 45 C. J. 720, 721, sec. 103.) Conceding that such may be the rule as applied to the theory of the case that appellant was guilty of deceit and knowingly and negligently performed an unnecessary abortion, it would not apply if the appellant had been merely negligent. (45 C. J. 918; *Armour & Co. v. Harcrow*, 217 Fed. 224, 133 C. C. A. 218; *Follet v. Illinois Cent. R. Co.*, 288 Ill. 506, 123 N. E. 592; *Monday v. St. Joseph R. Co.*, 136 Mo. App. 692, 119 S. W. 24; *Chicago, B. & Q. R. Co. v. Gelvin*, 238 Fed. 14, 151 C. C. A. 90, L. R. A. 1917C,

from the evidence that the plaintiff, Jean Nash, was to return to the defendant's office for further treatment, if necessar(y), the defendant would not be required to go from Caldwell to Boise to administer aid."

983; *Davies v. Shawver*, 134 Kan. 772, 8 Pac. (2d) 953; *Luck v. Gregory*, 257 Mich. 562, 241 N. W. 862, 244 N. W. 155; *Ingerson v. Shattuck School*, 185 Minn. 16, 239 N. W. 667; *Venzel v. Valley Camp Coal Co.*, 304 Pa. 583, 156 Atl. 240; *Hilson v. Pacific Gas & Elec. Co.*, 131 Cal. App. 427, 21 Pac. (2d) 662; *Newman v. Steuernagel*, 132 Cal. App. 417, 22 Pac. (2d) 780; *Cleghorn v. Thompson*, 62 Kan. 727, 64 Pac. 605, 54 L. R. A. 402; *Leavitt v. Stamp*, 134 Or. 191, 293 Pac. 414.)

Because of the prejudicial errors above noted the case is reversed and remanded for a new trial; costs awarded to appellant.

Morgan, Holden and Wernette, JJ., concur.